David Olusegun AKINMADE,
Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 97–71227.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 15, 1999

Filed Nov. 5, 1999

Thomas P. Redick, McKenna & Cuneo, San Diego, California, for the petitioner.

Francis W. Fraser, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: REINHARDT, WIGGINS, and HAWKINS, Circuit Judges.

REINHARDT, Circuit Judge:

David Akinmade petitions for review of the Board of Immigration Appeals' (BIA) decision denying his request for asylum and withholding of deportation. The BIA based its denial on an adverse credibility determination. That determination rests on insufficient and impermissible grounds. We deem the petitioner's testimony credible. We reverse the BIA's decision and remand so that the Attorney General may exercise her discretion under section 208(a) of the Refugee Act of 1980, 8 U.S.C. § 1158(a) (1990) with respect to petitioner's asylum request and grant his request for withholding of deportation.

## I. FACTS

The petitioner testified to the following facts. In late 1994, Akinmade began his university studies at the Agege College of Technology in Lagos, Nigeria. Two months later, he decided to join the student union, a local chapter of the National Association of Nigerian Students (NANS). The union served as a forum for its members to discuss their grievances against the university and their political opposition to the military government, headed by the notorious General Abacha.

At the time Akinmade joined the student union, the political climate in Nigeria was heating up. Throughout 1994 and the first half of 1995, episodic civil unrest had been occurring in urban areas. The brutal Abacha regime had begun clamping down on dissent by escalating its harassment of pro-democracy groups such as labor leaders, journalists, and student activists. See U.S. Dep't of State Asylum Claims & C'ntry Condtns. Rept., July 1995. To stamp out any semblance of democratic expression, security forces resorted to excessive use of force including arbitrary detention, mass arrests, and summary killings of peaceful protestors. *Id.*

Despite the risks, Akinmade became an active member of the student union. He joined his college's NANS chapter on January 10, 1995 and attended the organization's following two monthly meetings. On March 28, 1995, Akinmade, along with fellow members of the student union, helped organize a peaceful demonstration in the Lagos city streets. Akinmade decided to participate in the demonstration because in his view "it was a crucial one": the demonstration was planned by NANS and it was primarily directed to the peaceful overthrow of the military dictatorship.

The student union began the demonstration on the street and walked through to the city center. There, they were confronted by the police who came specifically looking for members of the student union. The police opened fire killing fifteen students and injuring many more. The police also arrested and jailed twenty-five students, including the petitioner and the secretary of the student union. The police took Akinmade's fingerprints and confiscated his identification card.

In detention, Akinmade and other students were tortured by the police. The police used electrical shocks and cut parts of Akinmade's body with a knife. They also beat him by hitting his genitalia with a heavy stick. The students were later taken outside the jail and placed in two vehicles. Akinmade overheard one police officer informing another that they were taking the students to a place where no one would find them or find out what happened. Shortly before leaving, a distraction occurred and Akinmade, along with two other students, climbed from their vehicle and ran. The police fired at them, but Akinmade was able to escape. He hid for two days. He was told by friends that the police were looking for him and that his life was in danger. Akinmade then fled the country. He left Nigeria on March 30, 1995, and subsequently attempted to enter the United States at the Los Angeles International Airport on April 28, 1995.

With respect to his escape and his later entry, Akinmade testified that, with the help of a contact who worked with the immigration service, he left the country on a plane to South Korea. He chose South Korea because that country does not require a Nigerian passport-holder to carry a visa. In South Korea, Akinmade had difficulty communicating with others because the majority of Koreans do not speak English. Akinmade slept in subway stations and roamed the streets for several days. Akinmade asserts that he had the good fortune to meet a Canadian citizen who took pity on him. This person, he contends, secured him a false Canadian passport and paid for his airfare.

When Akinmade arrived at the Los Angeles International Airport, he was stopped by an immigration official and con-

fronted with the fact that his passport was fraudulent. Akinmade acknowledged its falsity, explained that his life was in jeopardy in Nigeria, and requested asylum. The Immigration and Naturalization Service (INS) placed him in detention and commenced exclusion proceedings.

## II. LEGAL PROCEEDINGS BELOW

On June 30, 1995, Akinmade's case was heard by an Immigration Judge (IJ) who denied his request for asylum and withholding of deportation on credibility grounds. The IJ concluded: (i) the petitioner made inconsistent statements regarding the nature of his torture by the Nigerian police; (ii) the petitioner made inconsistent statements regarding the number of demonstrations in which he participated; (iii) the petitioner did not provide sufficient details of the nature of his arrest and detention; and (iv) aspects of the petitioner's account, including his being a student activist and his escape from Nigeria, were implausible. Akinmade appealed to the BIA. The BIA dismissed his appeal, also on the basis of a credibility determination. The BIA relied, however, only on three factors, all of which related to Akinmade's fraudulent entry, namely, his inability to: (i) explain the prior chain of custody of the Canadian passport; (ii) demonstrate his time of arrival in South Korea; and (iii) establish his date of birth by an appropriate certificate. The BIA referred approvingly to the IJ's opinion, but did not expressly adopt the IJ's conclusions as its own. Akinmade petitioned the United States District Court for the Central District of California for habeas corpus relief. The district court granted Akinmade's petition. The court held that each of the three factors the BIA explicitly relied on in its decision constituted an illegitimate ground for an adverse credibility finding. The court remanded the record to the BIA instructing the BIA to render a decision without reference to these three factors and with an explicit clarification if it intended to adopt the IJ's findings. The INS did not appeal.

In October 1997, the BIA again determined that Akinmade's account was not credible and denied relief on that basis. Notwithstanding the district court's instructions, the BIA again referred to its rejection of petitioner's account concerning the chain of custody of his fraudulent passport. The BIA also announced several other reasons for reaching its adverse credibility determination, including: (i) that the petitioner's fraudulent entry into the United States was inconsistent with his claim to be fleeing persecution; (ii) that the petitioner made inconsistent statements regarding his role in the student union; (iii) that the petitioner made inconsistent statements regarding the nature of his torture by the Nigerian police; and (iv) that the petitioner failed to provide corroboration for various aspects of his account. In an explicit but general statement, the BIA also adopted the IJ's conclusions regarding other purportedly inconsistent and implausible statements in the petitioner's application. Akinmade petitioned for review and we took jurisdiction under 8 U.S.C. § 1105(a).

## III. ANALYSIS

We review the BIA's credibility findings under the substantial evidence standard. *See Lopez–Reyes v. INS*, 79 F.3d 908, 911 (9th Cir.1996). Minor errors or inconsistencies, however, "do not constitute 'a valid ground upon which to base a finding that an asylum applicant is not credible,'" particularly where those inconsistencies reveal nothing about an applicant's fear for his safety. *Martinez–Sanchez v. INS*, 794 F.2d 1396, 1400 (9th Cir.1986) (citations omitted); *Osorio v. INS*, 99 F.3d 928, 931 (9th Cir.1996). Adverse credibility findings must be supported by "specific, cogent reason[s]," *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir.1987), and the reasons set forth must be "substantial and must bear a legitimate nexus to the finding." *Aguilera–Cota v.*

*INS*, 914 F.2d 1375, 1381 (9th Cir.1990); *Lopez–Reyes*, 79 F.3d at 911.

## A. Entry into the United States

■ The BIA erroneously concluded that Akinmade's fraudulent entry into the United States, namely his use of a false Canadian passport and his declaration that he was a Canadian citizen on a visit for pleasure, was inconsistent with his claim to be fleeing persecution.[1] The BIA stated: "[The applicant's] initial false declaration upon arrival into the United States is inconsistent with his claim that he was seeking asylum. Instead, his false declaration, together with his altered passport, is consistent with an attempt to enter the United States for a purpose other than to flee persecution." In *Turcios*, we held that an IJ's adverse credibility finding erroneously relied on the fact that the petitioner lied about his citizenship to INS officials and had entered the United States illegally. *Turcios*, 821 F.2d at 1396; *see also Aguilera–Cota*, 914 F.2d at 1382 n. 7. On three separate occasions Turcios had lied to INS officials by telling them he was from Mexico when he was actually from El Salvador. The *Turcios* court explained that false statements to the INS regarding one's nationality "by themselves are not reason for refusal of refugee status and it is the examiner's responsibility to evaluate such statements in the light of all the circumstances of the case." *Turcios*, 821 F.2d at 1400. The *Turcios* court recognized that in the circumstance of a refugee fleeing persecution, such "misrepresentations are wholly consistent with his testimony and application for asylum: he did so because he feared deportation to [his country of origin]. In this context, [the petitioner's] statement to the INS does not detract

from but supports his claim of fear of persecution. It does not support a negative credibility finding." *Id.* at 1400–01. Similarly, in the present circumstance, Akinmade's misrepresentations to immigration officials, in the course of fraudulently entering the United States, are wholly consistent with his claim to be fleeing persecution. As in *Turcios*, we recognize that a genuine refugee escaping persecution may lie about his citizenship to immigration officials in order to flee his place of persecution or secure entry into the United States. *Id.*

The *Turcios* rule applies to false documents as well as to false statements. After the BIA's decision in the present case, the Board, in the case of *In re O–D–*, Interim Decision 3334, 1998 WL 24904(BIA), carefully considered the bearing of an applicant's use of fraudulent documents upon credibility determinations in asylum cases. The BIA set forth a clear division between two categories of false document presentations: (1) the presentation of a fraudulent document in an asylum adjudication for the purpose of establishing the elements of an asylum claim; and (2) "the presentation of a fraudulent document for the purpose of escaping immediate danger from an alien's country of origin or resettlement, or *for the purpose of gaining entry into the United States.*" (emphasis added). In *O–D–*, the applicant stated that he was fleeing persecution from Mauritania. In the asylum proceeding itself, the applicant presented two fraudulent documents to the IJ claiming he was Mauritanian. The BIA concluded that the applicant's presentation of the fraudulent documents, "submitted to prove a central element of the claim in an asylum

---

**1.** At the outset of the immigration hearing, Akinmade admitted, first, to the charge of seeking entry into the United States by fraud or willful misrepresentation under section 212(a)(6)(C)(i) of the Immigration and Nationality Act and, second, to the charge of violating sections 212(a)(5)(A)(i) and 212(a)(7)(A)(i)(I) of the Act. On this basis, the IJ appropriately found Akinmade excludable.

An excludable alien is barred from entering the United States and may be deported. However, if the alien fears persecution, he can request asylum or, in the alternative, withholding of deportation. Akinmade's appeal does not concern the issue of excludability, but instead the denial of his petition for asylum and withholding of deportation.

adjudication, indicates his lack of credibility." *O–D–*, 1998 WL 24904. The BIA then carefully distinguished such false presentations from those in the second category of cases. In the second category, the use of false documents to facilitate travel or gain entry does not serve to impute a lack of credibility to the petitioner. The BIA stated, "there may be reasons, fully consistent with the claim of asylum, that will cause a person to possess false documents, such as the creation and use of a false document to escape persecution by facilitating travel." *Id.*

We agree with the BIA's classifications. We have also previously distinguished, for purposes of credibility determinations, false statements made to establish the critical elements of the asylum claim from false statements made to evade INS officials. *See Turcios*, 821 F.2d at 1400–01; *Ceballos–Castillo v. INS*, 904 F.2d 519, 520 (9th Cir.1990). The former, we have said, "involve[ ] the heart of the asylum claim," while the latter we have termed "incidental" to the asylum claim. *See Ceballos–Castillo*, 904 F.2d at 520. As the BIA made clear in *O–D–*, the same distinctions apply to the use of fraudulent documents. Akinmade's use of fraudulent documents to gain entry into the United States by supporting his claim that he was a Canadian citizen, like the claim itself, clearly falls in the second category of cases described in *O–D–* and cannot serve as a basis for an adverse credibility determination.

■ The BIA also erroneously relied on the fact that petitioner's account of his acquisition of the false passport and airline ticket was highly implausible. The BIA's analysis here is subject to the same objections as its reasoning about the petitioner's fraudulent means of entry. Whether the petitioner was directly involved in falsifying the Canadian passport, or whether he lied about how he obtained his airline ticket from South Korea to the United States, has little, if anything, to do with whether he fled Nigeria for fear of persecution. Moreover, in the habeas proceeding, the district court vacated and remanded the initial BIA decision with the instruction not to rely on the chain of custody of the false passport in determining the credibility of his asylum claim. We conclude that even if the petitioner lied about his involvement in the forging of the passport or about how he obtained his South Korean airline ticket, those acts would not support an adverse credibility determination. As with his fraudulent entry, the alleged conduct concerns facilitating travel and entry into the United States and is "incidental" to Akinmade's claim of persecution. *Ceballos–Castillo*, 904 F.2d at 520; *In Re O–D–*, 1998 WL 24904.

## B. Experiences in Nigeria

■ The BIA concluded that the petitioner gave an inconsistent account of the nature of his mistreatment by the police. The record, however, shows that, contrary to the BIA's contention, the petitioner explained that the police both tortured him, with electric shocks and a knife, and beat his genitalia with a stick. Both his affidavit and testimony adequately include references to these experiences. In addition, a concern that the affidavit is not "as complete as might be desired cannot, without more, properly serve as a basis for a finding of lack of credibility." *Aguilera–Cota*, 914 F.2d at 1382; *Lopez–Reyes*, 79 F.3d at 911.

The BIA also found inconsistencies in the petitioner's testimony concerning his role in the student union. Once again, the record reveals that the petitioner maintained a consistent account. He explained that he was a member of the student union, but as a student union member, was considered a leader within the student body. The record indicates that any discrepancies on this subject "were possibly the result of mistranslation or miscommunication" and not a sufficient basis for an adverse credibility finding. *Vilorio–Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir.1988); *Damaize–Job v. INS*, 787 F.2d 1332, 1337 (9th Cir.1986). The record also reflects

that when the IJ acted to resolve the translation difficulties, Akinmade clearly explained he was not a leader, but a member, of the student union. The IJ, in her decision, did not consider Akinmade's testimony on this matter to be inconsistent. The supposed discrepancies identified by the BIA are minor or non-existent and do not provide a valid basis for an adverse credibility determination.

An additional reason the BIA gave for its credibility finding was that Akinmade did not provide corroboration on a number of issues. First, we have explicitly refused to require corroboration in similar circumstances. *See Turcios*, 821 F.2d at 1403 ("Authentic refugees rarely are able to offer direct corroboration of specific threats or specific incidents of persecution. Therefore, an alien's unrefuted and credible testimony may be sufficient.... Furthermore, his act of abandoning his studies and fleeing [his country of origin] corroborates his testimony.") (citations omitted); *Lopez–Reyes*, 79 F.3d at 912; *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir.1984). We reaffirm that rule. Second, we conclude that the petitioner's account was more than adequately corroborated by the general descriptions of the political situation in Nigeria contained in the U.S. Department of State Report and Amnesty International publications.

The BIA also expressly adopted the IJ's other observations on the petitioner's lack of credibility. The IJ's conclusions, however, are not based on substantial evidence or valid explanations. First, the IJ erroneously concluded that Akinmade made inconsistent statements regarding the number of demonstrations in which he participated and the date of his confrontation with the police. The IJ misread or misunderstood Akinmade's affidavit. The affidavit clearly indicates, consistent with the petitioner's testimony, that he participated only in the demonstrations that occurred on March 28, 1995. On that day, his involvement in the demonstrations brought him into direct confrontation with the po-

lice, and resulted in his being arrested, booked, tortured, and later pursued by the police. The fragments of the affidavit that the IJ used to impeach Akinmade's credibility involve grammatical problems that do not constitute a valid basis for a credibility determination. *See Osorio*, 99 F.3d at 932.

Second, the IJ erroneously faulted Akinmade for not providing further details about the location and manner of his arrest and his mistreatment by the police. The IJ's concern for more specific information does not constitute a valid ground for denying Akinmade's claim, especially when Akinmade was not given notice that he should provide such information, nor asked at the hearing to do so, either by the IJ or by counsel for the INS. Akinmade's account is sufficiently descriptive of the pertinent events.

The remainder of the IJ's analysis is based on speculation and conjecture about the petitioner's account. Some of the IJ's reasons are even inconsistent with one another (e.g., speculating that the petitioner's father, as a member of the middle class, had influence in the military government and could therefore protect him; and speculating that the petitioner would not risk student activism because his father was a civil servant dependent on the government). The other concerns identified by the IJ (such as whether Akinmade's girlfriend could have had possession of his passport) do not raise substantial reasons or serious enough doubts for an adverse credibility determination. *See, e.g., Lopez–Reyes*, 79 F.3d at 912 (reversing implausibility determination because the IJ "did not set forth a 'specific cogent reason' for his astonishment"). Even if the alleged inconsistencies noted by the BIA existed, they would be insufficient collectively or otherwise to warrant an adverse credibility finding.

**C. Persecution on Account of Political Opinion**

■ We conclude that the BIA's credibility determination rested on insufficient

and impermissible grounds. As in other similar cases, under these circumstances, we deem the petitioner's testimony credible. *See Aguilera–Cota*, 914 F.2d at 1383; *Damaize–Job*, 787 F.2d at 1338. The BIA did not suggest reasons, other than credibility concerns, for denying petitioner's, request for asylum and withholding of deportation. Once found to be credible, "the evidence [the petitioner] presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The Nigerian military regime had begun to crack down on democratic activism. In this case, the police detained and tortured Akinmade on account of his political opinion, more particularly his involvement in anti-government, pro-democracy student activism. Akinmade narrowly escaped being killed by the police and fled the country while the authorities were still searching for him. Under these circumstances, the petitioner is eligible for asylum and may not be deported to Nigeria.

## IV. CONCLUSION

The BIA erroneously denied the petitioner's request for asylum and withholding of deportation. The BIA did not provide substantial reasons for concluding that petitioner's account of persecution was not credible. Once the petitioner's evidence is deemed credible, no reasonable factfinder could fail to find the requisite degree of persecution on account of political opinion. We reverse the BIA's denial of withholding of deportation and remand the asylum claim so that the Attorney General may exercise her discretion under section 208(a) of the Refugee Act of 1980, 8 U.S.C. § 1158(a) (1990).

REVERSED and REMANDED.

WIGGINS, Circuit Judge, Dissenting:

I respectfully dissent.

I believe the evidence is sufficient to find that the petitioner gained unlawful admission into the United States by means of a false Canadian passport. He made false statements to our immigration officials concerning his fraudulent passport and provided an exceedingly doubtful story concerning a good Samaritan who provided him the money to purchase an airline ticket from Seoul, Korea to Los Angeles, California.

The BIA concluded that he lied, not to Nigerian officials, but to United States agents.

The majority explains the falsehoods away. I cannot.

I respectfully dissent.