[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-15780
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 27, 2006
THOMAS K. KAHN
CLERK

BIA No. A79-453-719


RAMADAN LIKOLLARI,


                                                    Petitioner,


                          versus


U.S. ATTORNEY GENERAL,


                                                    Respondent.



_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(April 27, 2006)**

Before CARNES, WILSON and KRAVITCH, Circuit Judges.

PER CURIAM:

Ramadan Likollari, a native and citizen of Albania, seeks review of the Board of Immigration Appeals's affirmance of the Immigration Judge's order of removal. Substantial evidence supports the Immigration Judge's determination to deny Likollari's application for asylum on the ground that Likollari lacked credibility. Furthermore, because Likollari cannot meet the lower standard for asylum, we also deny his claims for withholding of removal and relief under the Convention Against Torture. Accordingly, we deny Likollari's petition.

## I. Background

Likollari attempted to enter the United States at Miami, Florida, by using a fraudulent Belgian passport. The Immigration and Naturalization Service ("INS")[1] initiated immigration proceedings, placing Likollari in "asylum only proceedings" pursuant to 8 C.F.R. § 208.2(b) (2001) as a visa waiver pilot program ("VWPP") applicant.[2] Immigration hearings for Likollari were held following his arrival in the United States, during which he sought relief under the Convention Against

---

[1] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, Stat. 2125. The HSA created a new Department of Homeland Security, abolished the INS, and transferred INS's functions to the new department.

[2] Under the VWPP, the Attorney General is permitted to allow aliens from certain countries to enter the United States for up to ninety days without a visa. INA § 217(a), 8 U.S.C. § 1187(a). Aliens who are admitted under this program agree to forfeit any challenge to removal, except on the basis of asylum. INA § 217(b), 8 U.S.C. § 1187(b). By regulation, aliens from Belgium are eligible for admission into the United States under the program. 8 C.F.R. § 217.2(a) (2001). Because Likollari attempted to enter the United States with a Belgian passport, he was classified as a VWPP applicant and was placed in "asylum only proceedings."

Torture ("CAT") and filed an application for asylum and withholding of removal claiming he was a refugee based on his political opinion.

In his application, Likollari stated that he had left Albania in February 2002. To show he was entitled to asylum, he asserted that in October 1999 he had participated in a demonstration organized by the Democratic Party of Albania in his hometown of Korce, Albania. He initially became involved in the party in 1995 as a member of the Youth Forum and became a full member in 1997. Likollari estimated that approximately 1000 people attended the demonstration, during which he and others held signs supporting the Democratic Party and opposing the Socialist Party. Socialist Party supporters stood behind a line of police officers and insulted the Democratic Party demonstrators. As the Democratic Party demonstrators approached the area where its scheduled speakers were to address the crowd, the police attacked the demonstrators, including Likollari, with police batons. Likollari eventually escaped from the melee.

Likollari's application stated that about one week after the demonstration, two men wearing army fatigues and masks arrived at his house at approximately 5:00 or 6:00 a.m. The men forced their way past Likollari's mother and found Likollari in his bed. They dragged him from his house, beat him, and placed him in a van. Seven men were in the van, and the beatings continued. The men brought Likollari to the police station where they placed him in a cell alone,

3

refused to allow him to obtain a lawyer, and beat him two or three times per day. Likollari had to rely on a man in an adjacent cell for food. Likollari stated that his captors did not interrogate him but they asked him why he was involved in the Democratic Party and tried to "scare me and harass me so that I would not be involved with the Democratic Party." After two days, his captors drove him outside the city and left him in the mountains, from which he walked home in two or three hours. He suffered a broken finger and an injured nose during his imprisonment and because he feared leaving his house, his mother treated his injuries. He remained a member of the Democratic Party following his detention and attended meetings at the party's headquarters but "tried not to be so involved in demonstrations" or "so much on the front line."

From January 2000 to January 2001, he served his obligatory time in the military. He stated that during his service, the Socialists continually harassed his brother, who was also a member of the Democratic Party, and forced his brother from a position as a police officer. At the time of Likollari's application, his brother's application for asylum in the United States was being heard.

Likollari's application also explained his father's 1989 imprisonment for insulting the former Socialist dictator. At the same time, the police detained and beat Likollari, his brother, and his mother. The police again arrested and beat his father in 1998, apparently because his father complained about irregularities in

4

voting for the constitution. Likollari also stated that the Socialists stole his father's land, which his father recovered when the Democratic Party returned to power.

At the hearing before the Immigration Judge ("IJ"), Likollari testified as follows: he was twenty-five years old and single and had worked on his family farm until he left Albania in February 2002. He was a member of the Democratic Party since his participation in the Youth Forum, and he became a full party member in 1997. His duties in the party included observing meetings and elections and attending demonstrations. The party held meetings every three or four months. Likollari participated in "many" demonstrations, including an "important one" in October 1999. Approximately 300 or 400 people attended the four or five hour demonstration that included Democratic Party leaders speaking out against the Socialist government. A group of Socialist counter-demonstrators threw things and yelled at the demonstrators, and a line of police officers protected the Socialists from the Democratic Party members. Eventually, the police clashed with the Democratic Party members, and Likollari was beaten before fleeing home.

Likollari testified that the following day two masked men abducted him from his house, placed him in a jeep or van, and brought him to a jail. Three or four other masked men were also in the vehicle, and the masked men beat Likollari. He was detained for two days at the police station where he was kept in a small cell, beaten with rubber sticks three or four times, and received food only

5

from a fellow prisoner. His captors also questioned him about the demonstration, called him a "dog", and asked him how he could be a member of the Democratic Party. After two days, his captors took him to the mountains and left him. He walked home, which took about three hours. On cross examination, he said that the captors left him near his home, and he took three hours to return home because he was traumatized. He further testified that during his imprisonment he sustained small wounds over his body and on his legs that his mother treated. When asked about the statement in his application that he had sustained a broken finger and injured nose, he stated that he had forgotten about those injuries when asked the initial question because the incident happened several years earlier.

As he stated in his application, Likollari testified that he left Albania in February 2002 when his father obtained the means to send him. Using a false Belgian passport, and after brief stops in Italy and Switzerland, he reached Ecuador, where he spent three months, before going to Colombia, where he spent one month, and eventually arrived in Miami, Florida in June 2002. Finally, he testified that he feared he would be killed if he returned to Albania because of his membership in the Democratic Party.

Likollari also supported his claims with the 2001, 2003, and 2004 State Department Reports on Albania, the 2003 European Communities Report, and a 2000 Amnesty International Report. The reports explained that the political

climate in Albania was unstable, that participation in elections resulted in violence, and that police engaged in excessive treatment. The reports clarified, however, that only limited instances of violence occurred after 1998 and that by 2001, members of the Democratic Party had parliamentary seats.

In his decision, the IJ noted that Likollari paused between thirty and sixty seconds several times before answering questions and that his answers were sometimes unresponsive to the questions asked. The IJ also noted Likollari was vague about details of the demonstrations and his involvement in the party and provided inconsistent information about the injuries he incurred during his detention. The IJ acknowledged, however, that the State Department Country Reports listed use of force against protestors, beatings by police, and an unstable political climate. After considering the testimony and other evidence and reciting the applicable law, the IJ denied relief, finding that Likollari was not credible, his testimony had been vague and unresponsive, and he failed to present other witnesses or corroborating evidence. The IJ noted Likollari's limited political participation and determined that he failed to establish past persecution or a well-founded fear of future persecution, especially considering that he remained in Albania for more than two years after the beatings and that his parents, who he admitted also faced beatings and participated in the Democratic Party, still lived there. Finally, the IJ concluded that Likollari could not meet the CAT standard

7

because he did not show that he had been singled out for torture. Accordingly, the IJ denied relief.

The Board of Immigration Appeals ("BIA") affirmed the IJ's decision without an opinion.

## II. Standard of Review

When, as here, the BIA adopts the IJ's decision, we review the IJ's decision as adopted by the BIA. Chacon-Botero v. U.S. Attorney Gen., 427 F.3d 954, 956 (11th Cir. 2005). To the extent that the IJ's decision was based on a legal determination, we review the decision de novo. D-Muhumed v. U.S. Attorney Gen., 388 F.3d 814, 817 (11th Cir. 2004). We review the IJ's factual determinations under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."[3] Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (quotation and internal marks omitted). A finding of fact will "be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of

---

[3] Congress recently passed the REAL ID Act, which altered this court's review of immigration appeals. In Huang, this court noted that pursuant to the REAL ID Act, all petitions for review are governed by the permanent rules, and that, under the Act as codified at INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), the Secretary of Homeland Security, in addition to the Attorney General, has discretion to grant asylum. Huang v. U.S. Attorney Gen., 429 F.3d 1002, 1008 n.3 (11th Cir. 2005).

the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). We also review the IJ's credibility determination under the substantial evidence test, and we should not "substitute our judgment for that of the [IJ] with respect to credibility findings." D-Muhumed, 388 F.3d at 818.

### III. Discussion

The Attorney General has discretion to grant asylum if an alien meets the INA's definition of "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). The INA defines "refugee":

> [A]ny person who is outside any country of such
> person's nationality . . . and who is unable or unwilling to
> return to, and is unable or unwilling to avail himself or
> herself of the protection of, that country because of
> persecution or a well-founded fear of persecution on
> account of . . . political opinion . . . .

8 U.S.C. § 1101(a)(42)(A) & (B). The asylum applicant bears the burden of proving refugee status. Al Najjar, 257 F.3d at 1284. To meet this burden, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. Al Najjar, 257 F.3d at 1287; 8 C.F.R. § 208.13(a), (b). This court has explained that "'persecution' is an extreme concept,

9

requiring more than a few isolated incidents of verbal harassment or intimidation, and . . . mere harassment does not amount to persecution." Sepulveda v. U.S. Attorney Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (internal quotations omitted).

If the alien establishes past persecution, he is presumed to have a well-founded fear of future persecution unless the government can rebut the presumption. D-Muhumed, 388 F.3d at 818 (citing 8 C.F.R. § 208.12(b)(1)(i), (ii)). If he cannot show past persecution, the alien must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable. Al Najjar, 257 F.3d at 1289. The subjective component can be proved "by the applicant's credible testimony that he or she genuinely fears persecution," and the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Yang v. U.S. Attorney Gen., 418 F.3d 1198, 1202 (11th Cir. 2005).

If an alien's testimony is credible, it may be sufficient, without corroboration, to satisfy his burden of proof in establishing his eligibility for asylum.[4] Forgue v. U.S. Attorney Gen., 401 F.3d 1282, 1287 (11th Cir. 2005); 8 C.F.R. § 208.13(a), § 208.16(b). In contrast, an IJ's denial of an asylum application can be supported solely by an adverse credibility determination,

---

[4] "However, the weaker the applicant's testimony, the greater the need for corroborative evidence." In re Y-B, 21 I & N Dec. 1136, 1139 (BIA 1998).

10

especially if the alien does not produce corroborating evidence. Forgue, 401 F.3d at 1287. If, however, the applicant produces other evidence of persecution, the IJ must consider that evidence and should not rely on an adverse credibility determination in those cases. Id.

"Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." In re B-, 21 I & N Dec. 66, 70 (BIA 1995). An adverse credibility finding must go to the heart of the claim, and not be based on minor discrepancies, inconsistencies, and omissions. Lui v. U.S. Attorney Gen., 156 F. App'x 270, 273 (11th Cir. 2005) (unpublished) (citing Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002)); Akinmade v. INS, 196 F.3d 951, 954 (9th Cir. 1999)). A single inconsistency may be sufficient to support an adverse credibility finding if the inconsistency relates to the alien's basis for his fear and goes to the heart of his asylum claim. Id. (citing Chebchoub v. INS, 257 F.3d 1038, 1043 (9th Cir. 2001)).

Here, the IJ concluded that Likollari's testimony lacked credibility. Substantial evidence supports this conclusion. The government points to several possible inconsistencies – e.g., the number of men involved in his kidnapping and the vehicle his kidnappers used – but Likollari's statements may not be inconsistent and, at least, do not go to the heart of his claim. However, Likollari provided vague information about his involvement in the Democratic Party, gave

11

unresponsive answers to questions[5], gave inconsistent testimony about the injuries he sustained during his imprisonment[6], gave drastically different estimates of the number of people involved in the October 1999 demonstration, and often paused for thirty to sixty seconds before answering his attorney's questions.[7]  These concerns go to the heart of Likollari's claim.  Forgue, 401 F.3d at 1287-88.  Even though the Country Reports show that the conduct that Likollari alleges occurs in Albania, he has failed to present evidence supporting *his* claim of persecution.  Especially considering this failure by Likollari, the IJ's adverse credibility finding is sufficient alone to deny Likollari's application for asylum.

Because Likollari failed to meet the lower burden to establish his eligibility for asylum, he cannot meet the higher burden to establish his eligibility for withholding of removal or relief under CAT.  Al Najjar, 257 F.3d at 1292-93.  Accordingly, the petition is DENIED.

---

[5] For example, his attorney asked, "Can you describe all of the activities that you joined in as a member of the Democratic Party?"  Likollari responded, "Fred Jola was also a member of the Democratic Party."

[6] When initially asked on cross examination about the injuries he sustained during his imprisonment, Likollari failed to mention the broken finger and injured nose that he noted in his application for asylum.  Likollari's assertion that he failed to mention the injuries because the incident occurred several years earlier is specious because he noted those injuries on the application for asylum filed a few months before the hearing and he recalled the exact dates of the demonstration and his imprisonment.

[7] Likollari had a translator because he apparently is not fluent in English.  The transcript of the hearing before the IJ suggests that Likollari's pauses occurred after the translator translated the attorney's questions.  We have no reason to believe, nor has Likollari alleged, that his pauses and unresponsive answers are attributable to a problem with the translator.