[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 18, 2006
THOMAS K. KAHN
CLERK

No. 05-15749
Non-Argument Calendar

_____

Agency No. A78-616-027

NADZI HASAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(May 18, 2006)**

Before TJOFLAT, BIRCH and KRAVITCH, Circuit Judges.

PER CURIAM:

Nadzi Hasan petitions for review of the Board of Immigration Appeals's

affirmance of the Immigration Judge's order of removal. The Immigration Judge gave specific and cogent reasons to explain her adverse credibility ruling, and substantial evidence supports that ruling. Therefore, we affirm the credibility determination and deny Hasan's petition.

## I. Background

Hasan, a native and citizen of Macedonia, was present in the United States without being admitted or paroled, and the INS[1] issued a Notice to Appear charging Hasan with removability under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i).

Hasan applied for asylum and withholding of removal under the INA and for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), 8 U.S.C. §§ 1158, 1231. Hasan attached a lengthy statement detailing, inter alia, the abuse he allegedly suffered at the hands of the Secret Police in Macedonia. Hasan alleged that ethnic Serbs dominated the government sanctioned Secret Police and persecuted him because of his nationality, Albanian and Turkish, and his political opinion. Hasan recounted the following events: the Hasan family was very active in political affairs affecting ethnic Albanians living in Macedonia. After Hasan's

---

[1] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, Stat. 2125. The Act created a new Department of Homeland Security, abolished the INS, and transferred INS's functions to the new department.

2

sister married into a politically well-connected ethnic Albanian family that lived in the United States, the police frequently detained and interrogated members of Hasan's family. Hasan alleged that the police feared that his father had arranged the marriage to increase the families' collective political clout, especially in influencing American politicians.

In 1989, the police detained and tortured Hasan's father for two weeks, and he died from the injuries three days after his release. Hasan's mother then was ordered out of her home and taken to Skopje. In 1991, Hasan became active in politics and was detained, arrested, and beaten following his participation in a demonstration. He was denied food and water during his several days' detention. Following a 1992 riot that broke out during a political demonstration in Skopje, the police detained Hasan and beat him with truncheons until he was unconscious. When his mother attempted to return to her home later that year, the police again detained, interrogated, and beat Hasan. In 1994, Hasan's mother was sent to Struga, where she was under constant surveillance. Later that year and again in 1995, Hasan was arrested and detained. Before his release following the 1995 detention, police warned him to cease his political activities. In 1997, Hasan was arrested, tied to a traffic sign, and beaten until he was unconscious. He was later summoned to the police station to answer questions and was ordered to sign a document. When he asked to read the document, the police refused and beat him.

After several days of this routine, the police allowed him to read the document, which was a confession admitting that Hasan incited racial and ethnic hatred. Hasan refused to sign the confession, and the police beat him again before releasing him. During a demonstration in Gostivar in 1998, police arrested Hasan. After his release, he received a summons to appear for questioning. At the station, he was forced to walk through a column of twenty policemen who hit him with truncheons. Because he could not stand following the beating, he was dragged to a cell by his hair. He was detained for ten days, interrogated about his sister, and again warned to stop his political activities. Later in 1998, following a speech by the chairman of the Democratic Party of Albania, Hasan was arrested and handcuffed to a traffic sign. Police beat him, breaking his ribs.

Hasan also explained that his cousin, who Hasan claims has received asylum in the United States, suffered similar persecution from the police until he escaped in 1999. After his cousin's flight, Hasan was detained and interrogated about his sister and cousin. Rather than tell the police that his cousin fled Macedonia, Hasan informed them that his cousin went to the United States for medical care. The police accused him of lying and beat him repeatedly. Hasan was detained three more times in 1999 and was placed under surveillance. Hasan then alleged that an incident that occurred in 2000 "would prove to be the most detrimental to me in Macedonia." As he was approaching a memorial service for three slain ethnic

4

Albanians, the police arrested him, placed a plastic bag over his head, and transported him to the police station. For several days, the police beat Hasan on his head and bare feet and ordered him to confess to conspiring against the government. The beatings were so severe that Hasan could neither walk nor stand. When the police released him, they said he would be summoned for further questioning shortly, and if he refused to confess, he would "die in the worse [sic] possible pain that could be imagined." After his release, he went into hiding with friends and decided to leave Macedonia for the United States. He alleges that he arrived in the United States about two weeks after his final release and days before he was to return to the police station for further questioning. Hasan alleges that, despite his many detentions, he was never charged with a crime.

At the hearing before the Immigration Judge ("IJ"), Hasan conceded his removability. He then testified: Hasan was born in Macedonia in 1965. He married after he filed his application for asylum, and his wife, an ethnic Albanian from Albania, obtained asylum in the United States before their marriage. He walked into the United States, without a visa, at Brownsville, Texas on July 31, 2000 after travelling from Albania to Mexico via Spain. In Macedonia, Hasan had been a member of the Albanian Democratic Party since 1985. Hasan's problems began in 1991, when he was arrested during a political demonstration. Hasan was imprisoned for three days, beaten, kicked, and punished and was never charged

5

with a crime. Hasan later stated that, despite his many detentions, he was never charged with a crime in part because the police did not want to bring him before a judge, who would see Hasan's severe injuries. After he was released, he did not seek medical attention because he feared further persecution if he did. He had similar problems in 1992, 1994, 1995, 1998, 1999, and 2000.

Although Hasan originally testified that the problems began in 1991, he then stated that the trouble began when his father died in 1989. Shortly thereafter, Hasan and his mother then were forcibly removed from their home because of the discrimination against ethnic Albanians. Hasan's mother was taken to Struga; Hasan moved several times, sometimes staying with his uncle in Debar. In 1992, Hasan tried to return to his home but was ejected again. In 1994, Hasan went to Ohlid to participate in political activities. He was arrested and forced to walk through two columns of police officers as the officers struck him on the head with batons. Despite his severe injuries, he did not seek medical treatment because he lacked the necessary money. In 1995, Hasan attended a demonstration in Tetovo, during which he was arrested, detained, and beaten. In 1997, Hasan was arrested in either Scopia or Gostivar.

Hasan also reported that the police called him in for questioning twice each in 1997 and 1998. Hasan could not remember how many times he had been arrested but stated that it could have been twelve or thirteen, or as many as fifteen

6

times. Hasan's last contact with the police was on March 25, 2000, when he was arrested, beaten, told to stop his political activities, and ordered to return for questioning on July 30, 2000. Hasan then said that he received the summons on June 10, 2000 and testified that the police questioned him about his cousin on June 5, 2000, at which point he told the police that his cousin went to the United States for medical treatment.

On cross-examination, Hasan stated that on July 25, 2000, he obtained the passport that he submitted to the court with the help of friends who had contacts in the police. The following day he illegally entered Albania, where he stayed only long enough to obtain a fraudulent passport and visa that he used to travel to Mexico via Spain. He testified that he never saw the fraudulent passport and visa because the people who helped him reach Mexico kept them. Once he reached Mexico, he walked across the United States border without inspection at Brownsville, Texas. The IJ noted that Hasan's passport did not have a signature. Additionally, Hasan could not produce information verifying his membership in any of the groups to which he allegedly belonged; nor did he have a birth certificate. Hasan further admitted that he had been arrested for DUI in Florida in 2002, but he could not explain why the fingerprints taken when he was arrested matched a person by the name of Shtetim Llomi with a different birth date. Although Hasan's sister, who was purportedly the individual who attended Hasan's

hearing before the IJ, and Hasan's cousin, who lived a few hours from hearing's location in Miami and to whom Hasan claimed he was very close, lived in the United States, Hasan failed to call either as a corroborating witness. According to Hasan, he did not realize that he needed to call witnesses. Hasan explained the discrepancies between his testimony and application as stemming from fear.

As corroborating evidence, Hasan submitted the State Department Report of Country Conditions in Macedonia for 2001 and 2002 and several articles from Amnesty International. The reports confirmed that members of the Albanian Democratic Party suffered abuse by police officers and detailed incidents similar to those alleged by Hasan.

The IJ denied relief and ordered Hasan removed. Citing the inconsistencies between the testimony and the asylum application, the IJ concluded that Hasan lacked credibility. The IJ based her finding on the vagueness and lack of details regarding the detentions, the inconsistent dates, the omissions and differences in the allegations, the lack of other corroborating evidence, and Hasan's failure to present evidence that he was a member of any of the organizations. The IJ further found that Hasan failed to establish his identity because the passport was not obtained from legal authorities and Hasan's fingerprints from a DUI arrest matched a person with a different name and date of birth. Accordingly, the IJ found that Hasan had not met his burden of proving eligibility for asylum, withholding of

removal, or relief under CAT.

The Board of Immigrations Appeals ("BIA") summarily affirmed the IJ's decision.

## II. Standard of Review

When, as here, the BIA adopts the IJ's decision, this court reviews the IJ's decision as adopted by the BIA. Chacon-Botero v. U.S. Attorney Gen., 427 F.3d 954, 956 (11th Cir. 2005). To the extent that the IJ's decision was based on a legal determination, we review the decision de novo. D-Muhumed v. U.S. Attorney Gen., 388 F.3d 814, 817 (11th Cir. 2004). We review the IJ's factual determinations under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."[2] Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (quotation and internal marks omitted). The IJ's credibility determination is a finding of fact that we review under the substantial evidence test, and we should not "substitute our judgment for that of the [IJ] with respect to credibility findings." D-Muhumed, 388 F.3d at 818. A finding of fact will "be

---

[2] Congress recently passed the REAL ID Act, which altered this court's review of immigration appeals. In Huang, this court noted that pursuant to the REAL ID Act, all petitions for review are governed by the permanent rules, and that, under the Act as codified at INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), the Secretary of Homeland Security, in addition to the Attorney General, has discretion to grant asylum. Huang v. U.S. Attorney Gen., 429 F.3d 1002, 1008 n.3 (11th Cir. 2005).

reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).

## III. Discussion

The Attorney General and Secretary of Homeland Security have discretion to grant asylum if an alien meets the INA's definition of "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). The INA defines "refugee":

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . nationality . . . or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A) & (B). The asylum applicant bears the burden of proving refugee status. Al Najjar, 257 F.3d at 1284. To meet this burden, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. Al Najjar, 257 F.3d at 1287; 8 C.F.R. § 208.13(a), (b). If the alien establishes past persecution, he is presumed to have a

10

well-founded fear of future persecution unless the government can rebut the presumption. D-Muhumed, 388 F.3d at 818 (citing 8 C.F.R. § 208.12(b)(1)(i), (ii)). If he cannot show past persecution, the alien must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable. Al Najjar, 257 F.3d at 1289. The subjective component can be proved "by the applicant's credible testimony that he or she genuinely fears persecution," and the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Yang v. U.S. Attorney Gen., 418 F.3d 1198, 1202 (11th Cir. 2005).

If an alien's testimony is credible, it may be sufficient, without corroboration, to satisfy his burden of proof in establishing his eligibility for asylum.[3] Forgue v. U.S. Attorney Gen., 401 F.3d 1282, 1287 (11th Cir. 2005); 8 C.F.R. § 208.13(a), § 208.16(b). In contrast, an IJ's denial of an asylum application can be supported solely by an adverse credibility determination, especially if the alien does not produce corroborating evidence. Forgue, 401 F.3d at 1287. If, however, the applicant produces other evidence of persecution, the IJ must consider that evidence and should not rely on an adverse credibility determination in those cases. Id.

---

[3] "However, the weaker the applicant's testimony, the greater the need for corroborative evidence." In re Y-B, 21 I & N Dec. 1136, 1139 (BIA 1998).

11

"Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." In re B-, 21 I & N Dec. 66, 70 (BIA 1995). An adverse credibility finding must go to the heart of the claim, and not be based on minor discrepancies, inconsistencies, and omissions. Lui v. U.S. Attorney Gen., 156 F. App'x 270, 273 (11th Cir. 2005) (unpublished) (citing Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002)); Akinmade v. INS, 196 F.3d 951, 954 (9th Cir. 1999)). A single inconsistency may be sufficient to support an adverse credibility finding if the inconsistency relates to the alien's basis for his fear and goes to the heart of his asylum claim. Id. (citing Chebchoub v. INS, 257 F.3d 1038, 1043 (9th Cir. 2001)).

Hasan's testimony and asylum application understandably confused the IJ and caused her to improperly classify certain information as inconsistent or incredible.[4] Nevertheless, despite the IJ's confusion on a few pieces of information, substantial evidence supports the IJ's adverse credibility

---

[4] For example, the IJ stated that Hasan gave inconsistent accounts of his father's death, first stating that his father died three days after being released from custody from injuries sustained during the detention, and then stating that his father was brutally executed. A review of the record shows that Hasan considered the term "brutally executed" as synonymous with the first account. The IJ also stated that Hasan could not name the leader of the Albanian Democratic Party, thereby casting doubt on his alleged involvement in the party. Hasan's testimony is confusing on this point, but we are unsure whether it shows that Hasan could not name the party's leader. Instead, we believe that the IJ's determination may have stemmed from Hasan's unclear attempt to distinguish between the national party, in which he was not a member, and the local party, in which he claimed to be a member. At any rate, we disregard this potentially discrediting information in our analysis.

12

determination.  Hasan's testimony and application were vague about his political involvement, provided inconsistent dates and locations of arrests, and gave inconsistent accounts of the abuse he allegedly suffered.

In his brief, Hasan contends that the inconsistencies regarding dates are insufficient to support the IJ's adverse credibility finding because: (1) the inconsistencies are understandable as significant time has passed since the incidents; and (2) the exact dates do not go to the heart of his asylum claim. According to Hasan, "the bottom line is that Petitioner was repeatedly beaten by the police."

When asked twice during his direct examination about his last interaction with Macedonian police, Hasan failed to note the July 11-15, 2000 incident that he referred to in his application as the incident that "would prove to be the most detrimental to me in Macedonia."  Instead, he first recounted a March 25, 2000 incident and then noted a June 5, 2000 incident in which the police questioned him about his cousin.  In his asylum application, he stated that the police often questioned him about his cousin but specifically noted that this particular incident of questioning about his cousin occurred on June 5, 1999.

Hasan's assertions fail because, in this instance, the order – and, by connection, the dates – of the events were inconsistent and go to the heart of his claim.  If the June 5 incident occurred in 1999, it was not the last interaction he had

13

with Macedonian police as he testified because both his testimony and application note a March 25, 2000 incident. If the incident occurred in 2000 and was, as he testified, the last interaction he had with Macedonian police, Hasan's credibility is in doubt regarding the July 11-15, 2000 incident that he noted in his application "would prove to be the most detrimental to me in Macedonia." Given the injuries Hasan allegedly sustained during and the language he used in his application to describe July 11-15, 2000 incident, we find it difficult to understand how Hasan could have failed to remember the incident as his final interaction with Macedonian police.

Considering the weakness of Hasan's testimony in certain respects, he was in greater need of corroborating evidence to support his claims of persecution. In re Y-B, 21 I&N Dec. at 1139. Nevertheless, Hasan failed to provide corroborating evidence specific to him. Hasan did not provide proof of his membership in any organization to which he allegedly belonged. Furthermore, Hasan failed to call corroborating witnesses, including his sister, who purportedly was the woman in the courtroom at Hasan's hearing, and his cousin, who lived within a few hours from the location of the hearing and who "took a very personal interest in [Hasan's] welfare," to support his claims of persecution.[5] Finally, although the

---

[5] Hasan testified that he did not know that he needed to present corroborating witnesses. In fact, Hasan is correct that he does not *need* to present corroborating witnesses, but the paperwork explaining the hearing explicitly states that the petitioner may call witnesses on his

country reports and Amnesty International articles discuss abuse of politically active members of the Albanian Democratic Party and ethnic Albanians generally, the reports and articles do not include specifics about any of the events in which Hasan alleged he participated. Therefore, they do not provide sufficient corroborating evidence to establish past persecution or a well-founded fear of future persecution. Because substantial evidence supports the specific and cogent reasons the IJ gave for her adverse credibility determination, Hasan's petition is DENIED.[6]

---

behalf. Furthermore, the asylum applicant bears the burden to establish his eligibility. Al Najjar, 257 F.3d at 1284

[6] Although Hasan challenges the IJ's denial of withholding of removal and relief under CAT, these claims are not properly before this court. In his appeal before the BIA, Hasan did not contest the IJ's decision on those grounds. Therefore, he has not exhausted the issues, and we do not consider them. Fernandez-Bernal v. U.S. Attorney Gen., 257 F.3d 1304, 1317 n.13 (11th Cir. 2001).