[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 14, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-11176
Non-Argument Calendar
_____

BIA No. A79-034-548

MOHAMMED SAFAD-HAMADE,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(August 14, 2006)**

Before CARNES, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

Mohammed Safad-Hamade petitions for review of the Board of Immigration

Appeals's ("BIA") summary affirmance of the Immigration Judge's ("IJ") order of removability. We conclude that the IJ's adverse credibility determination is supported by substantial evidence given the inconsistencies between Safad-Hamade's interview and testimony. Therefore, we deny the petition.

## I. Background

Safad-Hamade, a native and citizen of Syria, entered the United States near Eagle Pass, Texas, without being admitted or paroled, and the Immigration and Naturalization Service ("INS")[1] issued a notice to appear, charging him with removability under INA § 212(a)(6)(A)(i).

According to the INS report completed at the time Safad-Hamade was stopped, Border Patrol at Eagle Pass caught Safad-Hamade and numerous others as they crossed the Rio Grande from Mexico into the United States. During an interview, Safad-Hamade told authorities that he had a Syrian passport, but it was not with him. Instead, he had a British passport in another name with his photograph substituted. He denied any political affiliation or ever being arrested by the police and stated that he came to the United States for "unauthorized" work for his uncle. Additionally, INS found Safad-Hamade in possession of photographs that the Department of Justice believed were part of a Covert

---

[1] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, Stat. 2125. The Act created a new Department of Homeland Security, abolished the INS, and transferred the INS's functions to the new department.

Intelligence Collection Technique to identify potential targets.

Safad-Hamade applied for asylum, withholding of removal, and relief under the UN Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") claiming that he had been persecuted in Syria based on his nationality, social group, and membership in a political party. According to the application, Safad-Hamade was of Kurdish ancestry and his father and grandparents lost their citizenship and were "stateless." He noted that Kurds in Syria were mistreated and denied rights. He explained that he had participated in organizing meetings for the Kurdish Democratic Party ("KDP"), and on two occasions in 2000 and 2001, he was taken into custody while distributing materials for the KDP. The first time, he was detained for two hours and warned to cease his activities or he would be jailed. He stopped participating for a short time but ultimately resumed his activities. After that, he was taken into custody again and detained for three hours, verbally and physically abused, and threatened with jail. He feared he would be jailed if he returned to Syria.

At a hearing before an IJ, Safad-Hamade conceded his removability. He then testified as follows: He was born in 1973 in Halip, Syria, to a Syrian Arab mother and a Kurdish father. In Syria, children take their father's nationality. At the suggestion of some friends, he became interested in Kurdish rights while in high school. After high school, he entered the army and served for about two and

3

one-half years. Following his service, he became involved in the KDP because he wanted to advocate for equality and civil rights for Kurds. His participation in the party did not involve any violence; he distributed materials, organized meetings, and recruited new members.

In 2000, while distributing materials for the KDP, he was taken into custody by the state secret service and detained for about two hours. He was warned that if he continued his activities, he would be jailed. He was released only after he promised to cease his activities. After a few months of decreased involvement, Safad-Hamade returned to a more active role in the KDP. In 2001, the state secret service seized him from his home, twisted his arm behind his back, twisted his head, and pushed him into a car. During a subsequent three-hour detention and interrogation, he was physically and verbally abused. After he promised to stop his activities, he was released but was warned that he would go to jail forever if he continued in the KDP. Safad-Hamade then decided to leave Syria.

Because he is of Kurdish nationality, he could not hold a passport but was able to obtain a legitimate passport after his father bribed an official. He then traveled to Honduras via Spain, Miami, and El Salvador, and entered Honduras on a visitor's visa. He did not seek asylum in any of the countries through which he traveled. In Honduras, he met an Arab man who introduced him to a smuggler and was taken to Guatemala, where the smuggler gave him a British passport in another

4

name but with his photograph substituted. From Guatemala, he entered Mexico and crossed the border into the United States. He did not want to use his Syrian passport to gain entry into the United States because he believed that he would be deported immediately. He feared he would be jailed if he returned to Syria because his family had informed him that the authorities had been looking for him. Since his departure from Syria, Safad-Hamade had not been involved with any Kurdish causes.

On cross-examination, Safad-Hamade stated that when he was interviewed by INS officials upon arrival, he did not tell them that he was a member of the KDP because he thought he would be deported. He also explained that he said he had never been arrested by police because the police are different from the state secret service by whom he was detained. He conceded that he never mentioned his Kurdish background or that he wanted asylum but explained that he was frightened and told officials instead that he was in the United States to work for his uncle. As for the photographs, Safad-Hamade claimed that the smuggler told him to take photographs to show he was a tourist.

In support of his claim, Safad-Hamade presented the testimony of Mohammed Barazy, a Syrian Kurd, concerning the treatment Kurds received in Syria. Barazy, a U.S. citizen by marriage, stated that, based on his first-hand knowledge, Syria treated Kurds poorly, denying many of them citizenship,

5

property rights, and civil rights and access to education, passports, or identification. Kurds had difficulty obtaining food and could be jailed or exiled for voicing their objections. Some were beaten and tortured. Nevertheless, Barazy testified that he did not know Safad-Hamade and could not testify about the treatment Safad-Hamade had received in Syria. Safad-Hamade also supported his claim with: (1) a letter from the KDP confirming his membership and stating that he faced jail or death if he returned to Syria; (2) the U.S. Department of State Country Report for Syria; and (3) several articles, including some from Amnesty International, about the treatment of Kurds in Syria. The Country Report and articles confirmed that Kurds in Syria were commonly discriminated against, detained by authorities, and denied citizenship, property rights, access to Kurdish language and cultural expression, education, identification, and the right to vote or travel. Safad-Hamade also provided several documents to establish his identity and Kurdish background.

The IJ adjudicated Safad-Hamade removable and denied asylum, withholding of removal, and relief under CAT. Specifically, the IJ found that Safad-Hamade lacked credibility and had not established his identity. The IJ noted inconsistencies with the documents Safad-Hamade provided to prove his identity and Kurdish background. The IJ also noted the inconsistencies in the information given at the INS interview and at the hearing, particularly that Safad-Hamade did

6

not tell the INS officials that he was Kurdish or that he sought asylum. Moreover, the IJ pointed to Safad-Hamade's failure to provide more than basic information about the KDP, of which he alleged he was an active member. Alternatively, the IJ held that even if Safad-Hamade were credible, he failed to establish past persecution or a well-founded fear of future persecution.

Safad-Hamade appealed to the BIA, disputing the adverse credibility determination and the denial of relief. The BIA summarily affirmed.

## II. Standard of Review

When the BIA adopts the IJ's decision, we review the IJ's decision. Chacon-Botero v. U.S. Attorney Gen., 427 F.3d 954, 956 (11th Cir. 2005). To the extent that the IJ based his decision on a legal determination, we review the decision de novo. Ruiz v. U.S. Attorney Gen., 440 F.3d 1247, 1254 (11th Cir. 2006). We review the IJ's factual determinations under the substantial evidence test and "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record as a whole." Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001). We review the evidence in the light most favorable to the IJ's decision and "reverse[] only when the record compels a reversal."[2] Ruiz, 440 F.3d at 1255 (quoting Adefemi v. Ashcroft, 386

_____

[2] Because Safad-Hamade's case began before passage of the REAL ID Act, the new rules regarding credibility and corroborating evidence do not apply to his review. REAL ID Act § 101(e), (h)(3).

7

F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1035 (2005)).

The Attorney General or the Secretary of the Department of Homeland Security has the discretion to grant asylum if an alien meets the INA's definition of "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). The INA defines "refugee":

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The asylum applicant bears the burden of proving refugee status. Al Najjar, 257 F.3d at 1284. To meet this burden, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause such future persecution. Id. at 1287; 8 C.F.R. § 208.13(a), (b). If the alien establishes past persecution, he is presumed to have a well-founded fear of future persecution, but the government can rebut the presumption. D-Muhumed v. U.S. Attorney Gen., 388 F.3d 814, 818 (11th Cir. 2004) (citing 8 C.F.R. § 208.13(b)(1)(i), (ii)). If he cannot show past persecution, the petitioner must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable. Ruiz, 440 F.3d at 1257.

If an alien's testimony is credible, it may be sufficient, without

8

corroboration, to satisfy his burden of proof in establishing his eligibility for relief from removal. Forgue v. U.S. Attorney Gen., 401 F.3d 1282, 1287 (11th Cir. 2005); 8 C.F.R. §§ 208.13(a), 208.16(b).[3] In contrast, an IJ's denial of asylum relief can be supported solely by an adverse credibility determination, especially if the alien fails to produce corroborating evidence. Forgue, 401 F.3d at 1287. If, however, the applicant produces other evidence of persecution, the IJ must consider that evidence, and should not rely solely on an adverse credibility determination. Id. If the IJ determines that the alien lacks credibility, the IJ must offer specific, cogent reasons for the finding; the burden then shifts to the alien to show that the IJ's credibility decision was not supported by "specific, cogent reasons" or was not based on substantial evidence. Id.

"Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." Ruiz, 440 F.3d at 1255. An adverse credibility finding must go to the heart of the claim and not be based on minor discrepancies, inconsistencies, and omissions. Lui v. U.S. Attorney Gen., 156 F. App'x 270, 273 (11th Cir. 2005) (unpublished opinion) (citing Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002); Akinmade v. INS, 196 F.3d 951, 954 (9th Cir. 1999)). A single inconsistency may be sufficient

---

[3] "However, the weaker the applicant's testimony, the greater the need for corroborative evidence." In re Y-B, 21 I. & N. Dec. 1136, 1139 (BIA 1998).

9

to support an adverse credibility finding if the inconsistency relates to the alien's basis for his fear and goes to the heart of his asylum claim. Id. (citing Chebchoub v. INS, 257 F.3d 1038, 1043 (9th Cir. 2001)).

On appeal, Safad-Hamade challenges the IJ's adverse credibility determination, contending that the INS interview was incomplete and inconsistent but that his answers and information were consistent. He also accuses the IJ of misstating the testimony and State Department reports and improperly using one of his forms of identification, a voter registration card, against him. Thus, he contends that the IJ erred in finding that he lacked credibility.

Here, the IJ gave specific and cogent reasons for the adverse credibility determination. Safad-Hamade cannot show error, much less that the record compels the conclusion that the IJ erred. The records show several inconsistencies between Safad-Hamade's testimony and the information he provided to INS officials during his interview. For example, Safad-Hamade's reasons for coming to the United States were inconsistent. At the interview, he did not tell INS officials that he was Kurdish, that he was politically active, or that he had been harassed and interrogated based on his political activities. These contentions filled his testimony and application. In fact, during his interview, Safad-Hamade denied ever having been arrested by the police. Although he tried to differentiate the state secret service from the police, his denial that he had been arrested supports the IJ's

10

finding of inconsistencies. These inconsistencies go to the heart of his asylum claim because the basis for his claim is that as a Kurd in Syria, he is denied basic rights and threatened with jail and abuse, especially because of his involvement with KDP.[4]

Because substantial evidence supports the IJ's adverse credibility determination, we conclude that the record does not compel reversal. Therefore, we deny Safad-Hamade's petition.

**PETITION DENIED.**

---

[4] Because we conclude that the inconsistencies between the information provided at the interview and at the hearing support the IJ's adverse credibility determination, we do not address the IJ's credibility determinations about the documents Safad-Hamade provided to establish his identity and Kurdish background or the IJ's alternative findings that Safad-Hamade failed to establish past persecution or a well-founded fear of future persecution.