# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BASAAM BIBO GULLA; SOROB SABRI
GULLA,
                    *Petitioners,*

            v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 04-70957

Agency Nos.
A79-394-822
A79-394-823

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 11, 2007—Pasadena, California

Filed August 13, 2007

Before: Harry Pregerson, Ferdinand F. Fernandez, and
Eugene E. Siler, Jr.,* Circuit Judges.

Opinion by Judge Pregerson;
Dissent by Judge Fernandez

---

*The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge
for the Sixth Circuit, sitting by designation.

## COUNSEL

Douglas D. Nelson, Alejandro O. Campillo, A.P.L.C., San Diego, California, for the petitioners.

Kathryn DeAngelis (argued) and Lyle D. Jentzer, (brief) Office of Immigration Litigation, Washington, D.C., for the respondent.

## OPINION

PREGERSON, Circuit Judge:

Bassam Bibo Gulla petitions for review of the Board of Immigration Appeals' ("BIA") decision summarily affirming the Immigration Judge's ("IJ") decision denying his request for asylum. The IJ found Gulla to be credible and statutorily eligible for asylum. However, the IJ denied Gulla's asylum application based on discretionary factors. The IJ stated that he believed it improper to allow Gulla to obtain relief because (1) he traveled through three other countries before he arrived in the United States, (2) he was in good health and not of tender age, and (3) he used fraudulent travel documents to reach the United States. The IJ granted withholding of removal and, therefore, did not reach the CAT claim. We have jurisdiction

pursuant to 8 U.S.C. § 1252(a)(1). We hold that the IJ abused his discretion in denying asylum, and we grant Gulla's petition.

## FACTUAL BACKGROUND

Bassam Bibo Gulla is a thirty-four-year-old native and citizen of Iraq. He is Catholic and a member of the Chaldean ethnic minority. There are numerous reports and credible testimony by Gulla that the Catholic Chaldeans suffered general discrimination and persecution from the Iraqi government, the Ba'ath political party, and the Muslim population.

Gulla and his family have also been subject to heightened discrimination and abuse. In March 1973, Gulla's father was imprisoned by the Ba'ath party on suspicion for being a traitor and for "dealing" with the Kurdish opposition. Gulla's father told him that as a result of the imprisonment, the entire Gulla family was on a blacklist.

In August 1988, Gulla entered compulsory military service. Gulla was required to remain in the army longer than normal and he was stationed far from his home. He says that this treatment by his superiors was due to his religious affiliation, his refusal to join the Ba'ath party, and his family being blacklisted. During his term of service, Gulla was detained, imprisoned, beaten, and tortured by his superior officers. After the Army continually refused his requests to end his term of service, Gulla deserted in 1992 because he believed he was going to be killed by his superior officers. When the government announced that deserters would receive amnesty, Gulla turned himself in. However, because the government learned that two of Gulla's brothers had fled Iraq, Gulla was severely beaten and tortured upon his return to the military. Some of his beatings were so severe that he lost consciousness, and he continues to suffer from headaches and dizziness. He was not discharged from the military until 1994.

Gulla married Sorob Sabri Goro on September 23, 1996. On November 5, 1998, a local politician came to their house and told Gulla and Sorob they were wanted at the police station. They went to the police station immediately where the government separated Gulla and Sorob and questioned them. Gulla was detained for five days, during which time he was beaten and tortured. Sorob, who was two months pregnant at the time, was held one day. While she was detained, Sorob was beaten and frightened. Although she successfully fought off a sexual assault, she had a miscarriage. Gulla did not learn of his wife's situation until he was released four days later.

On July 2, 2000, Gulla was working in an agricultural field with some other workers. A man approached him and began asking questions about Gulla's farming activities. Gulla did not know the man or understand why he was questioning him. Nevertheless, Gulla answered the man truthfully and politely. The stranger, however, started yelling and swearing at Gulla. The stranger attacked Gulla, who hit him back. Later that day, the police detained Gulla and took him to the station. The stranger was at the station, and he accused Gulla of insulting him, the Ba'ath party, the government, and Sadaam Hussein. Gulla denied the allegations and offered to bring witnesses to the station to testify on his behalf. Gulla was not afforded an opportunity to present witnesses or tell his side of the story.

The police kept Gulla in local detention for two weeks. The police then transferred Gulla to a jail in Talkaif. While in the jail, he was interrogated and beaten daily. He felt certain that the guards would eventually kill him. On July 27, 2000, Gulla's brother bribed a police official to secure Gulla's freedom. As part of the negotiation between Gulla's brother and the police official, Gulla had to agree to flee the area upon release.

Gulla's brother smuggled him from the jail to a distant town in Kurdish territory. Sorob met Gulla there, and they determined that it would not be safe for them to remain in that

area. At the time, northern (Kurdish) Iraq was troubled by internal conflicts, and there were widespread abuses of human rights. Gulla testified that Christians in particular were subject to abuse and attack.

Gulla and Sorob paid a smuggler to obtain forged Iraqi passports for them and to help them escape Iraq. Gulla and Sorob then took a bus to Turkey. They did not feel safe in Turkey where there is also widespread discrimination against Christians. Turkey does not offer asylum or any type of protection for Iraqi refugees. In fact in 2001, Turkey had a practice of deporting Iraqis. Fearing discovery, Gulla and Sorob stayed hidden in an apartment during the month they were in Turkey. The Gullas then left Turkey and walked across the border into Greece. They did not plan to stay long in Greece because they did not believe Greece to be a safe place. Gulla and Sorob feared deportation and abuse. Therefore, they mostly remained hidden.

Through money from family members, the Gullas paid a smuggler to get them to the United States. The smuggler provided them with fake Danish passports and made travel arrangements to Mexico. The Gullas arrived in Mexico in August 2001. They went to Tijuana where they met one of Gulla's brothers and other countrymen. They went to the Mexico/U.S. border and applied for asylum.

The Gullas sought asylum in the United States because of their family ties here and because of their belief that they would be safe from persecution. Gulla's parents are legal residents of the United States. He has seven siblings. Three of his siblings are U.S. citizens. Two of his sisters remain in Iraq with their husbands, and two of his brothers are missing. Sorob also has family ties in the United States. One of Sorob's brothers is a U.S. citizen. The whereabouts of her other seven siblings and her mother are unknown. Her father is dead. Thus, her only relative who is not missing is in the United States.

## PROCEDURAL BACKGROUND

In August 2001, Gulla surrendered himself at the U.S./Mexico border and stated his intention to seek asylum. The border agents told Gulla to wait in Tijuana for an asylum interview. No interview occurred. On September 11, 2001, terrorists took over American jetliners and crashed them into the World Trade Center in New York and the Pentagon in Washington D.C. After that event, anti-Arab sentiments were high in Mexico and elsewhere.

On November 8, 2001, Gulla again went to the border and presented himself for refugee processing. At that point, INS agents took him into custody. The INS began removal proceedings that day. The INS issued a Notice to Appear, alleging that Gulla did not possess a valid document for admission in violation of 8 U.S.C. § 1182(a)(7)(A)(i)(I). On January 16, 2002, Gulla admitted the allegations in the Notice to Appear and conceded removability. He requested asylum, withholding of removal, and protection under the UN Torture Convention.

On August 2, 2002, Immigration Judge ("IJ") John Williams held a hearing on Gulla's asylum application. At that hearing, the IJ denied asylum, granted withholding of removal and never addressed whether Gulla was eligible for CAT relief. The IJ stated that Gulla was credible, and he held him statutorily eligible for asylum. The IJ found that Gulla had suffered persecution on account of his race and religion. The IJ denied asylum, however, after weighing discretionary factors. On August 12, 2002, Gulla appealed to the BIA. On February 18, 2004, the BIA affirmed without opinion the IJ's denial of Gulla's asylum petition. Gulla timely filed his petition for review before this court.

## STANDARD OF REVIEW

The Attorney General's decision to grant or deny asylum to an eligible applicant is reviewed for abuse of discretion. 8

U.S.C. § 1252(b)(4)(D); *Velarde v. INS*, 140 F.3d 1305, 1310 (9th Cir. 1998) (noting that BIA abuses its discretion if its decision is "arbitrary, irrational, or contrary to law"). Factual findings underlying the denial are reviewed for substantial evidence. *Ghaly v. INS*, 58 F.3d 1425, 1429 (9th Cir. 1995). Because the BIA summarily affirmed the IJ's opinion, "the IJ's decision becomes the BIA's decision and we evaluate the IJ's decision as we would that of the Board." *Lanza v. Ashcroft*, 389 F.3d 917, 925 (9th Cir. 2004).

## ANALYSIS

"Asylum is a two-step process, requiring the applicant first to establish his eligibility for asylum by demonstrating that he meets the statutory definition of a 'refugee,' and second to show that he is entitled to asylum as a matter of discretion." *Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004) (emphasis omitted). Once an "applicant establishes statutory eligibility for asylum, the Attorney General must, by a proper exercise of [ ] discretion, determine whether to grant that relief." *Navas v. INS*, 217 F.3d 646, 655 (9th Cir. 2000); *see also* 8 U.S.C. § 1158(b).

The IJ must "state its reasons and show proper consideration of all factors when weighing equities and denying relief." *Kalubi*, 364 F.3d at 1140 (internal quotation marks omitted). Conclusory statements are inappropriate, and the IJ must explain sufficiently how each factor figures in the balance so the court can determine that the factor has been heard, considered, and decided. *See id.* at 1141-42. In exercising his discretion, the IJ must consider both favorable and unfavorable factors, including the severity of the past persecution suffered. *See Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004) (holding that the IJ abused his discretion in failing to balance favorable factors against factors identified as negative).

**[1]** There is no dispute that Gulla was statutorily eligible for asylum. The IJ found that Gulla was a refugee with a well-

founded fear of persecution. Gulla's statements and fears were further supported by State Department Iraq country reports. Additionally, because the IJ found Gulla credible, this court takes Gulla's statements as true. *See Lopez-Alvarado v. Ashcroft*, 381 F.3d 847, 851 (9th Cir. 2004) ("Absent an explicit adverse credibility finding, a witness's testimony must be accepted as true.").

**[2]** The IJ denied Gulla's asylum application, however, based on discretionary grounds. We have repeatedly held that in an exercise of discretion related to an application for asylum, "all relevant favorable and adverse factors must be considered and weighed." *Kalubi,* 364 F.3d at 1139. The BIA has instructed that "the discretionary factors should be carefully evaluated in light of the unusually harsh consequences which may befall an alien who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Matter of Pula*, 19 I.&N. Dec. 467, 474 (BIA 1987). It is rare to find a case where an IJ finds a petitioner statutorily eligible for asylum and credible, yet exercises his discretion to deny relief. *But see Alsagladi v. Gonzales*, 450 F.3d 700 (7th Cir. 2006) (upholding discretionary denial of asylum where alien committed fraud in his dealings with the U.S. government).

Here, the IJ set forth the proper standard for reviewing asylum applications, explaining that he was weighing the various factors from *Matter of Pula*. However, the IJ's balancing of the various factors was arbitrary and irrational. In some places, the IJ appears to have misunderstood some of the underlying facts. Further, although the IJ explains that fear of persecution is the most important factor, he gave it little weight in his analysis.

## A.

The IJ denied Gulla's application after weighing several discretionary factors. The IJ found it especially significant

that Gulla used fraudulent travel documents to reach the United States and paid smugglers a significant amount of money to help him make the journey.

[3] Gulla and his wife had fake Iraqi passports, which they carried into Turkey and then Greece. Gulla then purchased fake Danish passports for himself and Sorob. They used the Danish passports to travel to Mexico. Gulla did not present either passport to the U.S. authorities in San Ysidro. When he surrendered himself at the border for the purpose of applying for asylum, he did not misrepresent his identity or present false documents. The INS did not charge Gulla with presenting fraudulent documents. Instead, the INS charged him with not having a valid visa or permit to enter the United States. Thus, although Gulla used false documents in his travels to the United States, he did not attempt to use fraud in his dealings with the United States.

[4] Gulla's use of false documents in his fleeing from Iraq is not a proper reason for denying asylum. In *Matter of Pula*, the BIA explained that whether an alien presents false travel documents or attempts to perpetrate a fraud on the United States is an important factor in assessing the discretionary decision to grant asylum. 19 I.&N. Dec. at 474 ("Moreover, if the alien engaged in fraud to circumvent orderly refugee procedures, the seriousness of the fraud should be considered.")

[5] We have stated in the past that an applicant's entry into the United States using false documentation is worth little if any weight in balancing positive and negative factors. *Mamouzian v. Ashcroft*, 390 F.3d at 1138. We have recognized that, to secure entry to the United States and to escape their persecutors, genuine refugees may lie to immigration officials and use false documentation. *See Akinmade v. INS,* 196 F.3d 951, 955 (9th Cir. 1999). When a petitioner who fears deportation to his country of origin uses false documentation or makes false statements to gain entry to a safe haven,

that deception "does not detract from but supports his claim of fear of persecution." *Id.* (quoting *Turcios v. INS,* 821 F.2d 1396, 1400-01 (9th Cir. 1987)). Accordingly, it would be anomalous for an asylum seeker's means of entry to render him ineligible for a favorable exercise of discretion.

**B.**

In making his discretionary decision to deny asylum to Gulla, the IJ found it significant that Gulla and his wife passed through three countries before arriving at the U.S. border. The IJ appeared to argue both that (a) Gulla should have applied for U.S. asylum at the U.S. embassies in Turkey, Greece, and Mexico, and (b) he should have applied for asylum from those countries. However, Gulla presented clear reasons for his failure to apply for asylum.

**[6]** The IJ held that Gulla's failure to apply for asylum earlier or to apply for asylum from one of the countries through which he traveled constituted circumvention of regular asylum procedures. This conclusion ignores the complexity of balancing the discretionary factors. Additionally, circumvention of procedures is insufficient to require the unusual showing of countervailing equities. In *Matter of Pula*, the BIA indicated that an applicant's travel through and interaction with a third country is a factor to consider when an IJ makes his discretionary determination regarding asylum. The BIA noted that this was a many-faceted issue.

> The totality of the circumstances and actions of an alien in his flight from the country where he fears persecution should be examined in determining whether a favorable exercise of discretion is warranted. Among those factors which should be considered are whether the alien passed through any other countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any coun-

try he passed through, and whether he made any attempts to seek asylum before coming to the United States. In addition, the length of time the alien remained in a third country, his living conditions, safety, and potential for long-term residency there are also relevant. For example, an alien who is forced to remain in hiding to elude persecutors, or who faces imminent deportation back to the country where he fears persecution, may not have found a safe haven even though he has escaped to another country. Further, whether the alien has relatives legally in the United States or other personal ties to this country which motivated him to seek asylum here rather than elsewhere is another factor to consider. In this regard, the extent of the alien's ties to any other countries where he does not fear persecution should also be examined.

19 I.&N. Dec. at 473-74.

**[7]** Gulla has no ties to Turkey, Greece, or Mexico. He was uncertain about their friendliness to Iraqis. He had several family members in the United States and felt that he would be safe here. His stays in Turkey and Mexico were brief. The situation in Turkey was not safe for Chaldean Christians during the time the Gullas were there, and they had no hope of attaining asylum there. Although the Gullas may have been able to get asylum in Greece, Gulla testified credibly as to why he feared the officers in Greece and why he believed asylum would be unavailable to him there. Further, during his year in Greece, Gulla only was able to find work two days a week, and he and Sorob feared venturing out of their apartment. Thus, although the Gullas passed through three other countries on their way to the United States, on balance the *Pula* factors do not demonstrate that denial of asylum is appropriate. Further, although the IJ quoted *Pula*, he did not adequately consider all of the different aspects of this case and balance the factors properly.

It is also important to consider the context in which Gulla sought asylum. He had been beaten and tortured. His brother helped him escape from prison. He used fake documents and crossed borders on foot. The whereabouts of several of his family members who tried to flee are still unknown. As Gulla testified, he firmly believed that he would be killed if he were returned to Iraq. He explained that if he was ordered removed he would instead seek a way to end his life rather than face the torture and eventual death that he believes awaits him in Iraq. Additionally, the attacks on the World Trade Center occurred in the midst of his asylum process. Tension against all Arabs was high at that point. Several news articles from that time tell of Mexican authorities detaining Chaldeans because of fears that they might be linked to Arab terrorist plots. *See, e.g.*, Letta Tayler, *America's Ordeal, Newsday*, Sept. 22, 2001, at A40.

## C.

**[8]** The IJ not only dismissed the significant presence of Gulla's family within the United States, but it appears that he misunderstood the situation of Gulla's parents. The IJ described Gulla's parents as having returned to Iraq to live with Gulla's sisters. Gulla testified, however, that his parents are hoping to return at the earliest possible time. Gulla's aunt was dying. Therefore, his parents returned to Iraq to be with his aunt on her death bed. Shortly after the death of his aunt, Gulla's father fell ill. His illness was serious and led to significant surgery. At the time of the hearing before the IJ, Gulla's father had recovered and his parents were trying to return to the United States. Indeed, Gulla stated that they had planned to attend his hearing, but had not yet been able to return. The IJ's statement indicates that the IJ likely misunderstood this situation as he described Gulla's parents as having returned to Iraq to stay.

**[9]** Gulla's two sisters who remain in Iraq are protected by their husbands, do not live in the family's ancestral town and

did not face the same problems of persecution. The IJ mentioned their presence in Iraq in his decision, indicating that Gulla and his wife still had strong ties to Iraq. Such a conclusion is arbitrary and irrational.

Finally, both Gulla and his wife have several family members whose whereabouts are unknown. These family members fled Iraq, and no one knew where they were at the time of Gulla's hearing before the IJ. This included two of Gulla's brothers and the parents and siblings of Gulla's wife. Asserting that their unknown whereabouts was a negative factor in determining whether Gulla merited asylum is not rational.

## D.

The IJ also denied Gulla asylum because he believed that Gulla circumvented the ordinary immigration process. However, Gulla did not bypass orderly procedures. He presented himself at the border and stated his desire to apply for asylum. He did not sneak into the country. He did not use fraudulent documents to enter the country.

The IJ also stated that he did not feel that Gulla should "be place ahead of other similarly situated Chaldean Christian Iraquian." This statement appears to assume that all Chaldean Christians are seeking asylum in the United States. Indeed, the IJ stated that there are "5, 6, or maybe 700,000" Chaldean Christians in Iraq who want to come to the United States.[1] Gulla presented significant credible evidence that he and his family were specifically targeted for persecution. Gulla personally experienced imprisonment, beatings, and torture. Additionally, this was mere conjecture on the part of the IJ;

---

[1]The Chaldean Federation of America estimates the total number of Iraqi Christians worldwide at 600,000 (down from 1 million before the reign of Saddam Hussein). They estimate that 200,000 are fleeing or have fled Iraq. There is no evidence that all of them (or even the majority) are seeking asylum in the United States.

there is no evidence that hundreds of thousands of other Chaldean Christians were similarly abused and are now seeking asylum.[2]

## CONCLUSION

[10] The IJ abused his discretion in failing to balance favorable factors against factors identified as negative. The IJ gave little weight to the documented persecution and beatings. The IJ brushed aside the Gullas's health concerns and their strong ties to family members in the United States. The IJ did not appear to take into consideration the fact that Gulla was credible and had not committed any fraud against the government. Gulla has not committed any crimes that would bar him from relief. The danger of persecution generally outweighs all but the most egregious adverse factors. The IJ's arguments that Gulla could have applied for asylum at an earlier point and the fact that Gulla used fake travel documents to escape what he believed was certain death, are insufficient to deny asylum in light of the many factors in Gulla's favor. Gulla presented credible evidence of past persecution. Gulla demonstrated likely future persecution and torture if returned to Iraq. He testified honestly, and he did not perpetrate any fraud on the U.S. government. For the forgoing reasons, we find that the IJ abused his discretion in denying asylum.

Petition GRANTED; REMANDED for further proceedings.

---

[2]Further, even if there was evidence of thousands of others seeking asylum, all refugees who have clear evidence of significant persecution and abuse should be eligible for asylum. Hypothetical numbers of potential asylum applicants is not a basis for denying relief to someone who has a demonstrated valid claim.

FERNANDEZ, Circuit Judge, dissenting:

On the facts of this case, I cannot say that the BIA abused its discretion;[1] I cannot say that it acted in a manner that was arbitrary, capricious or contrary to law[2] when it denied asylum. As I see it, the majority's decision to the contrary is another example of our picking apart the opinions of the agency, while purporting to apply an abuse of discretion standard. *See, e.g., Kumar v. Gonzales*, 444 F.3d 1043, 1060-61 (9th Cir. 2006) (Kozinski, J., dissenting). It is just another chapter in our divide-and-conquer strategy. *See Kaur v. Ashcroft*, 379 F.3d 876, 890-91 (9th Cir. 2004) (Tallman, J., dissenting); *see also United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 751, 151 L. Ed. 2d 740 (2002) (reflecting on the impropriety of divide-and-conquer analysis when reasonableness is in question). That strategy can make it seem that we are deferring when we are not actually doing so. It is not appropriate. In fact, Congress expressed its disdain for that approach when it amended the Immigration and Nationality Act to blunt some of the more obvious maneuvers. *See* 8 U.S.C. § 1158(b)(1)(B). Unfortunately, the amended statute does not control this case,[3] and its mere existence has not yet induced us to remove any of the sudd that makes it so difficult for immigration judges to navigate when either the credibility or the reasonableness of an alien's behavior is in question. Of course, the mere fact that Gulla was credible is not sufficient to show that he acted reasonably; those concepts should not be conflated.[4]

Thus, I respectfully dissent.

---

[1] *Lopez-Galarza v. INS*, 99 F.3d 954, 960 (9th Cir. 1996).

[2] *Andriasian v. INS*, 180 F.3d 1033, 1040 (9th Cir. 1999).

[3] It applies "to applications for asylum, withholding, or other relief from removal made on or after" May 11, 2005. REAL ID Act § 101(h)(2), Pub. L. 109-13, 119 Stat. 231, 305 (2005).

[4] It should also be noted that while it is true that in *Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987), the BIA indicated that in exercising dis-

cretion "the danger of persecution should generally outweigh all but the most egregious of adverse factors," that was in the context of a case where withholding of deportation had also been denied. Here, Gulla was granted withholding of removal, which makes a great difference; he will not be returned to Iraq. *See Kalubi v. Ashcroft*, 364 F.3d 1134, 1141 (9th Cir. 2004); *Pula*, 19 I&N Dec. at 474. We should not vastly expand our review by ignoring *that* crucial difference.