**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HARMINDER SINGH,

*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney General,

*Respondent.*

No. 05-70722

Agency No. A078-668-359

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
September 2, 2009—San Francisco, California

Filed May 3, 2011

Before: J. Clifford Wallace, Diarmuid F. O'Scannlain and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Kleinfeld

## COUNSEL

Ajai Mathew (argued), Law Office Ajai Mathew, and Manpreet Singh Gahra (briefed), Law Office of Manpreet Singh Gahra, Berkeley, California, for the petitioner.

Jason S. Patil, U.S. Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

---

## OPINION

KLEINFELD, Circuit Judge:

We address the effect of lying in an asylum application and to an asylum officer on an adverse credibility finding.

## FACTS

Harminder Singh is a native and citizen of India. He, his parents, and his sisters went to Canada, where they lived for two and a half years. They applied unsuccessfully for asylum in Canada. After the denial, they somehow entered the United States "without inspection," and Singh applied for asylum here. The Immigration Judge (IJ) denied his claim, the Board of Immigration Appeals (BIA) affirmed without opinion, and Singh petitions for review. We deny the petition.

Singh's application for asylum in the United States, which he swore to be true, was, as he has subsequently acknowledged, a lie. He answered "no" to the question asking whether he had ever filed for or been granted or denied asylum by any other country, and claimed to have resided in India during the two and a half years he actually lived in Canada. He submitted numerous documents with the application, including a sworn affidavit stating that the affiant knew Singh's whole family was active in Sikh politics and he, his father, and his mother had been arrested several times, a statement by an Indian lawyer alleging the same thing, and a hospital certification indicating that Singh had been treated for a week for "multiple blunt injuries on [his] whole body." Singh subsequently admitted that all these documents were fake, he was never arrested, his mother was never arrested, and Singh had

been in Canada at the time of the supposed medical treatment in India.

The political persecution Singh claimed in his asylum application was for Sikh activism. He claimed that he, his father, and his mother had all been arrested repeatedly because of the family's participation in Sikh politics. The police, he said, had tortured both him and his father in the past and had continued their persecution until he left India in 2000. Subsequently, he admitted that he was in Canada from 1997 on, his mother had never been arrested, and Singh himself had never been arrested, nor had he been tortured or beaten by the police. Nor was his family engaged in Sikh activism. He had simply lied.

Singh had two asylum interviews. He testified that at the first one, he verified that everything in his false application was true because Avtar Singh Gill, who had prepared Singh's immigration application, accompanied him and told him to stick to his story. The second time, Gill was not present, but Singh was upset because of the recent death of his mother, and Gill had threatened to tell the government the truth, that he had been in Canada when he had claimed to be in India, so Singh again reaffirmed the truth of the false application.

Subsequently Singh filed what he called "corrections" to his asylum application and testified before the IJ about the falsehoods in it. He conceded that he had left India three years before coming to the United States. The "corrections" disclosed two and a half years' residence and his unsuccessful application for asylum in Canada. According to the new statement, his father had been a successful professional photographer at a tourist location in Kashmir (not the owner of a refrigeration and air-conditioning business as Singh had previously sworn), but had moved to Delhi in 1990 because of Muslim hostility to non-Muslims, and had subleased his Kashmir property to a Muslim. The police had arrested his father in 1996 on suspicion of aiding Kashmiri separatists (not

Sikh activism), and after his father was released, the family moved to Canada. Far from being active in Sikh politics, Singh's father was not a member of any political group in India. Singh's new story had nothing of the Sikh activist claim that he had sworn to in the asylum application. Nor did the new story allege that Singh was beaten, or that he, his father, and his mother were arrested multiple times.

Before the IJ, Singh testified that his father was arrested on December 20, 1996, beaten and tortured, and then released on bail. Subsequently, the police repeatedly came to the Singh residence asking about the alleged Kashmiri separatists and threatening that if the family did not tell them, "they would take us into captivity and commit atrocities against us." The following summer, the family moved to Canada. They remain in touch with their extended family and former neighbors in India.

At Singh's merits hearing, government counsel introduced the fraudulent documents for their bearing on Singh's credibility. Singh conceded that he had perjured himself previously, before the asylum officer, but asked that the IJ listen with an open mind to his testimony since he conceded previously testifying falsely. The IJ did so, rejecting the government's suggestion the past falsehoods alone made a hearing unnecessary. Since the only arrest, torture, and beating claimed was of Singh's father rather than Singh, the IJ asked where the father was. Singh's attorney said that the father was in the United States, but that the father's mental health had deteriorated since his wife's death and he would not be a competent witness. The IJ asked if there was medical evidence to support the claim of incompetence. Singh's counsel conceded that there was none. Counsel added, "[E]very time I speak to him and you mention his wife, he breaks down because of the events they went through."

Government counsel suggested that Singh needed corroboration, particularly since Singh had previously lied and the

only harm claimed was to the father. Since the father also had an asylum application pending, government counsel asked for a written waiver of confidentiality for the father's asylum file so that if he did testify, the father could be effectively cross examined. The asylum regulations limit disclosure of information in an asylum application "without the written consent of the applicant."[1] The IJ advised Singh's lawyer that Singh had the burden of proof, and it would be "much heavier in a situation like this where there is—he has completely changed his story and particularly where he admits to having lied under oath at the asylum office." Because of this, the father's testimony might be crucial corroboration. If he was not going to testify because of incompetence, there should be something more than Singh's lawyer's opinion, such as a psychological evaluation. And if he was, he should be designated on the witness list, and absence of a written waiver might be a problem. After discussion of what dates would be mutually convenient for all counsel and the court, the hearing was adjourned for three and a half weeks, which Singh's attorney said would be fine. No testimony was taken at this first hearing. Testimony was put off until continuation of the hearing at the agreed-upon later date.

At the next hearing, Singh's father was in court, though no witness list naming him had been filed. Though Singh's sisters lived with him in Hayward, California, Singh had not brought any of them to the hearing. Singh's counsel said that he still did not think the father was competent to testify, but he had no medical evidence, so the judgment on competence would be one for the court to make. Singh's lawyer proposed to ask the father about his own asylum application and offered

---

[1] 8 C.F.R. § 208.6(a) ("Information contained in or pertaining to any asylum application, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.").

an oral waiver of confidentiality. The IJ postponed deciding whether the father could testify until after hearing Singh's own testimony.

Singh then told his new story, about police suspicion that his family aided Kashmiri (not Sikh) separatists. He explained that he had previously given his false story because Gill had prepared his application with the false story and told him that he should not disclose his lengthy Canadian residency because "that's not good for our case." Singh said that even though the application was in his own handwriting, he had copied from what Gill had written for him. But he feared returning to India, because "they are going to question me about my father, where my father is. If I do not tell them where my father is, they are going to kill me at that time, at that very instant." He conceded that his father's pending asylum application also contained "errors": falsely claiming persecution in India when he was actually in Canada, omitting the unsuccessful asylum application in Canada, and leaving out his son Singh in the blanks for "all your children." Singh said he did not have his passport, because if the family had returned to the Canadian authorities to get their passports back, they would have been deported.

Counsel and the court discussed, both at the beginning and the end of Singh's testimony, what to do about testimony from his father, who was present in the courtroom. Singh's lawyer explained his earlier questioning of the father's competence to testify: "It's not like he's seeing a doctor or anything, but he suffers from severe anxiety attacks and he's most of the time [ ] not very coherent." He said he had tried to get him medically evaluated Friday of the previous week at Kaiser Permanente (the hearing was on Monday), but it had not been possible. The father had separate counsel, who was not present, but Singh's lawyer said the father's lawyer did not object to the father testifying. Government counsel objected to the father testifying because he had not been listed on Singh's witness list, his competence was questioned and

no medical evaluation had been done, no written waiver had been obtained so the government would not be able to cross examine effectively, and the father's lawyer was not present to confirm the father's waiver of confidentiality for his own asylum application.

After Singh's testimony had concluded, Singh's lawyer said he would only ask the father two questions, why he left India and why he was claiming asylum, and would expect answers consistent with Singh's. Government counsel continued to object, and the IJ said he did not think the father's testimony would in the circumstances be crucial. Singh's lawyer then rested his case. Government counsel argued that there was a *Sidhu* issue.[2] The IJ announced that "if the parties were to rest on this record," she would deny asylum. Singh had not borne his burden of proof, she said, on account of failure to corroborate his new story despite having admittedly perjured himself when swearing to his earlier story, and she would not grant asylum even if she found him credible. The father's testimony might or might not bolster Singh's credibility, since it might offer some other reason to believe him or might simply tend to show that they together lied about being persecuted in India when they were actually safe in Canada. Singh then changed his position on resting his case, and asked for a continuance to perform the necessary tasks so that the father could testify. The IJ denied the request.

The IJ decided that Singh had not borne his burden of proof. She found that Singh had submitted a false application for asylum, along with false documents, and then had sworn to "an entirely different story." She noted that at the first of the two hearings, she had told Singh's attorney that he should

---

[2]*Sidhu v. INS*, 220 F.3d 1085, 1092 (9th Cir. 2000) (holding that "where the IJ has reason to question the applicant's credibility, and the applicant fails to produce non-duplicative, material, easily available corroborating evidence and provides no credible explanation for such failure, an adverse credibility finding will withstand appellate review").

either have the father available to testify after she had continued the hearing for three and a half weeks, with an executed waiver of confidentiality, or have something verifying his lack of competence, but Singh's attorney did neither. Although the father was present at the continued hearing, he had not been medically evaluated, his lawyer was not present, and had not executed a written waiver of confidentiality. Singh's asylum application with the false story had been entirely in Singh's handwriting. He had testified to the false story at his asylum office interviews, one with Gill present and one without. The court was troubled not only by Singh's admitted perjury and false documents but also by the absence of corroboration for the new story. The father's testimony had not been introduced, and Singh's sisters, who lived with him and who were "obviously material witnesses," did not testify. The IJ therefore reasoned that Singh had not "been a credible witness in that he has perjured himself in the past and has failed to present anything other than his own testimony when other forms of evidence could have been available to him."

The BIA summarily affirmed the IJ, and Singh appealed.

## ANALYSIS

Singh argues that the IJ's adverse credibility finding was not supported by substantial evidence in the record, and that he was denied due process of law by the denial of a continuance so that he could put his father on the stand.[3] Where, as here, the BIA summarily affirms the IJ, we review the IJ's

---

[3]He also argues that he was eligible for asylum, should have been granted withholding of removal, and was entitled to relief under the Convention Against Torture. The first claim depends on overturning the adverse credibility finding, the second on the first, *see Pedro-Mateo v. INS*, 224 F.3d 1147, 1150 (9th Cir. 2000) (noting that a failure to satisfy the lesser standard for a grant of asylum necessarily results in a failure to demonstrate eligibility for withholding of removal), and the third on evidence showing a probability of torture, *see* 8 C.F.R. § 208.16(c)(2), which was absent.

decision as the final agency action.[4] We review the findings of fact, including adverse credibility determinations and the findings underlying the denial of relief, for substantial evidence.[5] We review due process claims de novo, and will reverse only "if the proceeding was 'so fundamentally unfair that the alien was prevented from reasonably presenting his case.' "[6]

## I.   Credibility.

   **[1]**  Singh argues that because the IJ found his testimony to be internally consistent on direct and cross and consistent with his second application for asylum, the facts he swore to had to be deemed true, and the IJ was not entitled to reject his credibility because of his failure to provide corroboration. He provides quotations from several of our decisions that might, taken out of context, provide support for those propositions.[7]

---

   [4]*Sandoval-Luna v. Mukasey*, 526 F.3d 1243, 1245 (9th Cir. 2008); *Lanza v. Ashcroft*, 389 F.3d 917, 925 (9th Cir. 2004).

   [5]*INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

   [6]*Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) (quoting *Platero-Cortez v. INS*, 804 F.3d 1127, 1132 (9th Cir. 1986).

   [7]Singh cites these cases in support of his proposition: *Kataria v. INS*, 232 F.3d 1107, 1114 (9th Cir. 2000); *Ladha v. INS*, 215 F.3d 889, 893 (9th Cir. 2000) (explaining that "the BIA erred . . . in requiring corroborative evidence to support the Ladhas' credible testimony" and that "when an alien credibly testifies to certain facts, those facts are deemed true, and the question remaining to be answered becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief"); *Cordon-Garcia v. INS*, 204 F.3d 985, 992-93 (9th Cir. 2000) (noting that the "court recognizes the serious difficulty with which asylum applicants are faced in their attempts to prove persecution, and has adjusted the evidentiary requirements accordingly" (citation omitted)); *Campos-Sanchez v. INS*, 164 F.3d 448, 451 n.1 (9th Cir. 1999) ("[I]f the BIA finds the petitioner credible . . . it should not require corroborating documents in order to establish his claim of a well-founded fear of persecution." (emphasis omitted)); *Velarde v. INS*, 140 F.3d 1305, 1310 n.5 (9th Cir. 1998) (noting that this court has "repeatedly emphasized that no such corroboration is required"); *Lopez-Reyes v. INS*, 79 F.3d 908, 912 (9th Cir. 1996)

This case is pre-REAL ID Act, so the provision in that statute that the trier of fact may require corroboration, even for "otherwise credible testimony"[8] does not apply to this case.

Context is all, though. In some of the cases Singh cites, the BIA assumed credibility but nevertheless required corroboration.[9] In some, there was no explicit credibility determination.[10] And in the rest, the comments cited by Singh are factually distinguishable.[11] None stand for the proposition that testimony both internally consistent and consistent with the asylum application must be deemed credible, or that credibility cannot be rejected on account of an absence of reasonably avail-

---

("Supplying corroborating affidavits . . . has never been required to establish an applicant's credibility."); *Aguilera-Cota v. INS*, 914 F.2d 1375, 1380 (9th Cir. 1990) ("We have previously tried to make it clear that asylum applicants are not required to produce documentary evidence of events such as those involved here.").

[8]8 U.S.C. § 1158(b)(1)(B)(ii).

[9]*See Ladha v. INS*, 215 F.3d 889, 897 (9th Cir. 2000).

[10]*See Kataria v. INS*, 232 F.3d 1107, 1113 (9th Cir. 2000); *Cordon-Garcia v. INS*, 204 F.3d 985, 992-93 (9th Cir. 2000).

[11]*See Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999) (stating that the BIA failed to give notice to the applicant that his credibility was in question and an opportunity to respond even though the IJ had found him credible); *Velarde v. INS*, 140 F.3d 1305, 1310 (9th Cir. 1998) ("It is also unclear to what extent the BIA, like the IJ, discounted the weight of Velarde's uncontroverted testimony (despite finding her credible) due to a lack of 'corroboration.' Ultimately, the BIA simply fails to state why it finds that Velarde did not meet her burden, apart from the single case citation to *Matter of Fuentes*." (footnote omitted)); *Lopez-Reyes v. INS*, 79 F.3d 908, 912 (9th Cir. 1996) (reversing adverse credibility determination based on an "inaccurate reading of the record and on improper inferences"); *Aguilera-Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir. 1990) (reversing the IJ's adverse credibility determination that had been based on the fact that "Aguilera's oral testimony included information not set forth in his asylum application" and "Aguilera had no proof that the threatening note [forming the basis of his asylum claim] had been delivered").

able corroboration, regardless of any other circumstances. Neither proposition is correct.

The burden of proof is on the asylum seeker, not the government.[12] Asylum cases differ from ordinary civil cases in that the events happened in foreign countries, and the expense and difficulty of obtaining corroboration can be overwhelming. Persecuting regimes may control the flow of information so that corroboration is impossible, despite the truth of an asylum seeker's account. Asylum cases also differ in that expense, difficulty, or impracticability may render it impossible to prove the falsity of an asylum seeker's allegations of fact. That is why we have described the whole adjudication as an "honor system—it depends largely on the assumption that asylum seekers will take the oath seriously, and that they will be truthful in their testimony. . . . [I]n order for the process to work, we must construe and enforce the oath strictly, so that we may be more lenient elsewhere in the process."[13] In an ordinary civil case, lawyers depose witnesses and obtain documents to prove or disprove witnesses' allegations, but in asylum cases there are no depositions and usually no documents except what the asylum seeker submits and general country information occasionally supplemented by an individualized State Department letter.

So how is the IJ supposed to decide whether someone is lying? One way is internal consistency. If the person cannot tell substantially the same story twice in substantially the same way, that suggests a likelihood that the story is false. But just because the asylum seeker does tell the story consistently, that does not establish that it is true. "That's my story and I'm sticking to it"[14] is a comic line suggesting falsity, not

---

[12]*See* 8 C.F.R. § 1208.13(a) ("The burden of proof is on the applicant for asylum . . . ."); *Mejia-Paiz v. INS*, 111 F.3d 720, 722 (9th Cir. 1997) ("[T]he petitioner bears the burden of persuading the IJ that his evidence is credible . . . .").

[13]*Martinez v. Holder*, 557 F.3d 1059, 1065 (9th Cir. 2009).

[14]*See* Noël Coward, *Relative Values* (1951) ("Yes, Peter, it is and you needn't look quizzical either. That's my story and I'm sticking to it.").

evidence of truth. Inconsistency may suggest falsity, at least where the differences are not of the sort that honest people make in repeated accounts of the same events, but consistency does not establish truth.[15]

Likewise, documentary evidence, or its absence, may or may not tend to show that a story is true or false, depending on the circumstances. Sometimes corroboration by documents or testimony is reasonably available and any sensible litigant would expect to have to produce it, sometimes not. We would not expect a police report from a tyrannical regime saying, "We tortured this individual to make him reveal his political associates' names." But if the asylum seeker whose credibility has been questioned testifies that his family was subjected to atrocities in their home, and corroboration is readily available because members of the family live with him in California, it is reasonable to question his credibility if none of them testify to corroborate his account. To be sensible, rather than a collection of arbitrary rules, asylum litigation can draw a lesson from other litigation. In the most routine personal injury case, when a plaintiff credibly testifies that the collision caused $5,000 in medical expenses, the jury is likely to reject and is free to reject his damages testimony unless it sees the medical bills. Though it does not apply to this case, the REAL ID Act "made asylum litigation more like other litigation" in this respect.[16]

---

[15]Of course, the IJ's adverse credibility determination must still be supported by substantial evidence on the record as a whole. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

[16]*Aden v. Holder*, 589 F.3d 1040, 1045 (9th Cir. 2009). See 8 U.S.C. §§ 1158(b)(1)(B)(ii) and (iii) ("The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates

Of course, if someone is escaping a persecuting regime, he may need to lie his way out, and lie his way into a safe haven to seek asylum, even though he is not generally to be distrusted. The BIA takes the position that "[t]he use of fraudulent documents to escape the country of persecution itself is not a significant adverse factor . . . ."[17] We held, consistently with this principle, in *Gulla v. Gonzales* that "although Gulla used false documents in his travels to the United States, he did not attempt to use fraud in his dealings with the United States,"[18] and therefore his "use of false documents in his fleeing from Iraq is not a proper reason for denying asylum."[19] Ordinarily one shows the same documents, typically a passport and perhaps a visa, to get on the plane to get out of a country, and to get through immigration to get into the destination country, so we have extended the *Pula* doctrine to the documents used

otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence. . . . Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.").

[17]*In re Pula*, 19 I&N Dec. 467, 474 (BIA 1987); *see also id.* ("Moreover, if the alien engaged in fraud to circumvent orderly refugee procedures, the seriousness of the fraud should be considered. The use of fraudulent documents to escape the country of persecution itself is not a significant adverse factor while, at the other extreme, entry under the assumed identity of a United States citizen with a United States passport, which was fraudulently obtained by the alien from the United States Government; is very serious fraud.").

[18]498 F.3d 911, 916-17 (9th Cir. 2007).

[19]*Id.* at 917.

to get into the United States, in *Akinmade v. INS*[20] (use of false documents to enter the United States in certain circumstances is "wholly consistent with [an applicant's] claim to be fleeing persecution."[21]). Similarly, we held in *Turcios v. INS* that falsely claiming to be from Mexico instead of El Salvador did not impugn credibility where the alien had reason to fear persecution if deported to El Salvador rather than Mexico.[22] And (before the REAL ID Act establishing the contrary) we held in *Kaur v. Ashcroft* that where the IJ finds the asylum seeker to be otherwise credible, the petitioner's testimony cannot be held insufficient to bear the burden of proof because of lack of credible corroborating evidence, where the corroborating evidence was not readily available because it would have to come from persons living outside the United States.[23]

**[2]** We have not held, and could not reasonably hold, that an asylum applicant's past lies may never support an adverse credibility determination. The asylum seeker bears the burden of proving that he has a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion."[24] If the proof he offers depends on his testimony, as it usually does, and substantial evidence justifies rejection of the truth of the testimony, then an adverse credibility decision is supported. While the special circumstances of needing to lie one's way out of a persecuting country and perhaps use fraudulent documents to get out of that country and into another may weaken or vitiate the adverse inference that might otherwise be drawn from past lies in other circumstances, lies and fraudulent documents

[20]196 F.3d 951 (9th Cir. 1999).

[21]*Id.* at 955.

[22]821 F.2d 1396, 1400-01 (9th Cir. 1987).

[23]379 F.3d 876, 889-90 (9th Cir. 2004).

[24]8 U.S.C. § 1101(a)(42)(A).

when they are no longer necessary for the immediate escape from persecution do support an adverse inference.[25]

**[3]** In this case, that is what the IJ had. Singh continued to perjure himself and present fraudulent documents even when he was safely in the United States, away from his supposed persecutors in India. Moreover, he had fabricated the very basis of his asylum application. That sufficed to raise a legitimate doubt about his credibility. And he failed to produce any corroboration for his second story, even though he lived with his sisters in Hayward and there was no evident reason why he could not have brought one or both to his hearing. They could have testified about the police visits to the family home in India, if his allegations about those visits were true. Unlike the asylum seeker in *Zi Lin Chen v. Ashcroft*,[26] Harminder Singh was given notice at the first merits hearing that a relative might be necessary to corroborate his story, and was granted a continuance of three and a half weeks to arrange for it.

**[4]** When the IJ has reason in the record to doubt the applicant's credibility, an absence of evidence may itself suffice as substantial evidence "on the record considered as a whole"[27] for rejecting credibility, where the need for the evidence should have been plain and the evidence would have been reasonably accessible. In this respect, we ordinarily instruct juries that "[i]f a party fails to call a person as a witness who has knowledge about the facts in issue, and who is reasonably available to the party, and who is not equally available to the other party, then you may infer that the testimony of that per-

---

[25]Because they raise unique issues not applicable here, we do not address asylum claims arising out of the expedited removal process which an inspecting officer can institute, pursuant to 8 C.F.R. § 235.3(b), upon an arriving alien's entry in the United States.

[26]362 F.3d 611, 620-21 (9th Cir. 2004).

[27]*INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal quotation marks omitted).

son is unfavorable to the party who could have called the witness and did not," and that "[i]f a party fails to produce evidence that is under that party's control and reasonably available to that party and not reasonably available to the adverse party, then you may infer that the evidence is unfavorable to the party who could have produced it and did not."[28] Even pro se litigants in small claims court typically bring with them the invoices, checks, photographs, and other documents for which the need and probative value is apparent. There is no good reason for lower standards in Immigration Court.

**[5]** Asylum seekers, especially when represented by counsel, do not usually face the disadvantage of an adversary from their home countries presenting impeaching or contradictory testimony. An IJ cannot be required to accept as true any internally consistent story from the asylum seeker. A past falsehood, even an intentional one, does not necessarily defeat credibility, because it may be capable of being explained away. Nor does a consistent story, with an explanation for every problem including past perjury compel acceptance of credibility. We cannot fault the IJ's determination in Singh's case that "[i]n other circumstances, the court would find him to be a credible witness. However, the court does not believe it is inappropriate in a situation where the respondent has admittedly perjured himself in the past to require of him additional documentation or corroborating evidence of his claims." Fraud in the asylum application is a " 'legitimate articulable basis to question the petitioner's credibility,' " and that together with past perjury and the absence of reasonably available corroboration amounts to a " 'cogent reason for [the IJ's] stated disbelief.' "[29]

---

[28]3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions* 149-50 (5th ed. 2000).

[29]*Martinez v. Holder*, 557 F.3d 1059, 1060 (9th Cir. 2009) (quoting *Valderrama v. INS*, 260 F.3d 1083, 1085 (9th Cir. 2001).

## II. Continuance.

**[6]** Singh claims he was denied due process of law because the IJ denied him the opportunity to put his father on the stand to corroborate his testimony. The argument has several strands. The main one appears to be that he should have been given a continuance to get a written waiver. That argument fails because he had already received a continuance of three and a half weeks to get whatever he needed: medical evidence of incompetence to testify, a written waiver, or anything else. The government had pointed out the need for a written waiver at the earlier hearing. The regulations said "written waiver," so there could be no surprise.

**[7]** Singh also appears to be questioning the IJ's remark that the father's testimony "would make no difference." That remark was made in the context of deciding whether to grant a second continuance. Since Singh's counsel conceded that the father had likewise submitted a fraudulent application, claiming persecution in India during the two and a half years that he and the family spent in Canada, the IJ's comment indicates that a second continuance would not be justified by the strength of the evidence that it might generate. Singh's case is not like *Kaur v. Ashcroft*,[30] where the son was present in court ready to corroborate his mother's account, yet was not permitted to testify because the IJ prejudged the persuasiveness of the as yet unheard testimony. Here, although Singh's father was present in court, his lawyer was not. Singh's father had his own asylum application pending, and was not available for testimony and cross examination because he had not executed a written waiver of his right to confidentiality. And while the IJ specifically requested medical evidence pertaining to the father's competency, Singh's father came to court without any medical statement one way or the other. His testimony was as a practical matter unavailable despite his physical presence.

---

[30]388 F.3d 734 (9th Cir. 2004).

Conceivably, had the IJ continued a hearing a second time, and allowed what would amount to a third hearing, some weeks following, a medical statement regarding incompetency would have been obtained, or after consultation with his own lawyer the father would have waived confidentiality in writing, and the father would have persuasively corroborated Singh. But the IJ was not required to grant a continuance based on these speculations. Under 8 C.F.R. § 1003.29, an IJ "may grant a motion for continuance for good cause shown." Nevertheless, " '[t]he decision to grant or deny the continuance is within the sound discretion of the judge and will not be overturned except on a showing of clear abuse.' "[31] The IJ did not abuse her discretion by denying a second continuance in this case.

## CONCLUSION

Substantial evidence on the record as a whole supported the adverse credibility decision, the need for corroboration, and the conclusion that Singh had not borne his burden of proof to establish eligibility for asylum. The IJ did not abuse her discretion in denying another continuance.

PETITION DENIED.

---

[31]*Sandoval-Luna v. Mukasey*, 526 F.3d 1243, 1247 (9th Cir. 2008) (quoting *De la Cruz v. INS*, 951 F.2d 226, 229 (9th Cir. 1991)).